**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KALEEL HINTON,** | : | |
| **Plaintiff** | : | **No. 1:22-cv-00554** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **M. HOUSER, DSCS, et al.,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

Presently before the Court are Defendants' motion for summary judgment and pro se

Plaintiff's motion to accelerate a hearing on the motion for summary judgment.  For the reasons

set forth below, the Court will grant Defendants' motion and deem Plaintiff's motion withdrawn.

**I.    BACKGROUND**

**A.    Procedural History**

Pro se Plaintiff Kaleel Hinton ("Hinton"), a convicted and sentenced prisoner

incarcerated in a facility operated by the Commonwealth of Pennsylvania Department of

Corrections ("DOC"), commenced this action by filing a complaint, an application for leave to

proceed in forma pauperis ("IFP Application"), and his certified prisoner trust fund account

statement, all of which the Clerk of Court docketed on April 15, 2022.  (Doc. Nos. 1–3.)  In the

complaint, Hinton names as Defendants: (1) M. Houser ("Houser"), the Deputy Superintendent

for Centralized Services ("DSCS") at Pennsylvania State Correctional Institution Benner

Township; (2) T. Miller ("Miller"), a Corrections Classification and Program Manager at

Pennsylvania State Correctional Institution Rockview ("SCI Rockview"); and (3) J. Rivello

("Rivello"), a Deputy Superintendent for Facilities Management at Pennsylvania State

Correctional Institution Huntingdon.  (Doc. No. 1 at 1–3.)

On April 21, 2022, the Court issued an Order which, <u>inter</u> <u>alia</u>, granted the IFP Application and directed the Clerk of Court to send copies of the complaint as well as requests to waive service to Defendants. (Doc. No. 6.) Defendants waived service (Doc. No. 9) and later filed an answer with affirmative defenses to the complaint on October 5, 2022 (Doc. No. 16).[1] After Defendants filed their answer, the Court issued an Order on October 11, 2022, establishing a discovery deadline of April 11, 2023, and a dispositive motions deadline of June 12, 2023. (Doc. No. 17.)

Thereafter, apparently in opposition to certain of Defendants' affirmative defenses, Hinton filed: (1) a "Brief in Opposition to Defendant's [sic] Preliminary Objections" in which he argued that, <u>inter</u> <u>alia</u>, he properly exhausted his administrative remedies under the Prison Litigation Reform Act ("PLRA") and has alleged Eighth and Fourteenth Amendment claims upon which relief can be granted, <u>see</u> (Doc. No. 19); (2) "Preliminary Objections to Strike Defendants [sic] Preliminary Objections and the Immunity Defense" in which he asserted that, <u>inter</u> <u>alia</u>, Defendants are not entitled to qualified immunity, his legal claims are sufficient, and he properly requested compensatory and punitive damages in his complaint, <u>see</u> (Doc. No. 20); (3) "Preliminary Objections" in which he sought to strike Defendants' affirmative defense of qualified immunity, <u>see</u> (Doc. No. 21); and (4) several separately docketed exhibits (Doc. No. 22), all of which the Clerk of Court docketed on October 26, 2022.[2] On the same date, Hinton

---

[1] Among their affirmative defenses, Defendants assert that Hinton failed to exhaust his administrative remedies, they are entitled to qualified immunity, Hinton failed to state any claim upon which relief may be granted, and Hinton is not entitled to compensatory or punitive damages. (Doc. No. 16 at 14–16.)

[2] Hinton appears to intend that these exhibits would sequentially follow the exhibits he attached to his complaint insofar as his complaint contained nine (9) exhibits (Doc. Nos. 1-1–1-9) and these separately docketed exhibits are numbered ten (10) through thirteen (13) (Doc. No. 22).

also filed a motion to compel discovery, a brief in support of the motion, and separately filed

exhibits.  (Doc. Nos. 23–25.)  Defendants filed a response in opposition to Hinton's motion to

compel discovery on November 10, 2022.  (Doc. No. 26.)

On November 28, 2022, the Court entered an Order denying Hinton's motion to compel

discovery as well as his "Preliminary Objections to Strike Defendants [sic] Preliminary

Objections and the Immunity Defense."  See (Doc. No. 27).  In denying Hinton's "Preliminary

Objection to Strike Defendants [sic] Preliminary Objection and the Immunity Defense," the

Court explained as follows:

> The purpose of an answer to a complaint is for a defendant to give a plaintiff notice
> of the allegations in the complaint that the defendant admits and/or denies, as well
> as the affirmative defenses that the defendant asserts in response to the complaint.
> See Fed. R. Civ. P. 8(b), (c).  Thus, the Court finds that [Hinton's] legal arguments
> and "preliminary objections" in response to Defendants' answer are unnecessary at
> this juncture of the litigation.  If and when Defendants file a dispositive motion,
> [Hinton] will have the opportunity to respond to that motion in accordance with the
> Federal Rules of Civil Procedure and the Local Rules of this Court.

See (id. at 2–3).

On March 30, 2023, Defendants filed motions to take Hinton's deposition and for an

extension of time to complete discovery (Doc. Nos. 28, 29), both of which the Court granted by

separate Orders issued on April 17, 2023 (Doc. Nos. 30, 31).  The Court also established a new

discovery deadline of June 9, 2023, and a dispositive motions deadline of August 8, 2023.  (Doc.

No. 31.)

On July 31, 2023, the Clerk of Court docketed a collective submission from Hinton in

which he appears to have recopied or refiled his previously submitted "Preliminary Objections,"

compare (Doc. No. 21), with (Doc. No. 32 at 1–2), his "Preliminary Objections to Strike

Defendants [sic] Preliminary Objections and the Immunity Defense," compare (Doc. No. 20),

with (Doc. No. 32 at 3–8, 37–39), and his "Brief in Opposition to Defendant's [sic] Preliminary

Objections," compare (Doc. No. 19), with (Doc. No. 32 at 9–36), with only minor alterations. Included with these documents was a letter in which he asks the Court to "construe [his] 'Brief in Opposition to Defendant's [sic] Preliminary Objections, Preliminary Objection to Strike Defendants' Preliminary Objection and Immunity Defense' as a brief for summary judgment sur [sic] no genuine dispute to any material fact stands and the movant is entitled to judgment as a matter of law," see (Doc. No. 32-1 (citing Fed. R. Civ. P. 56(b)), as well as several exhibits (Doc. No. 32-2).

Defendants filed the instant motion for summary judgment on August 8, 2023.  (Doc. No. 33.)  After receiving several extensions of time (Doc. Nos. 34, 35, 38, 39, 41, 42), Defendants filed a statement of undisputed material facts as well as a brief in support of their motion on October 27, 2023 (Doc. Nos. 45, 46).  Hinton has not filed a response in opposition to this motion; however, he did file a "Motion to Accelerate Hearing on Motion for Summary Judgment," which the Clerk of Court docketed on December 31, 2024.  See (Doc. No. 54). Hinton did not file a brief in support of this motion.

**B.    Factual Allegations, Legal Claims, and Requests for Relief in the Complaint**

Hinton alleges that he was committed to the DOC in March 2013 for fifteen (15) to thirty (30) years for multiple armed robberies.  (Doc. No. 1 at 4.)  Hinton indicates that he was "on the mental health roster, indicating that he had a need for mental health care."  See (id.).

4

Hinton was participating in the "probation period" of SCI Rockview's "SMU" Program in April 2020,[3] when he incurred a "DC-141 disciplinary sanction" resulting in sixty (60) days' confinement in the Restricted Housing Unit ("RHU"). See (id.; Doc. No. 1-1 at 1). The misconduct report leading to this disciplinary sanction charged Hinton with: (1) threatening an employee with bodily harm; (2) using abusive, obscene, or inappropriate language to or about an employee; (3) refusing to obey an order; and (4) presence in an unauthorized area. (Doc. No. 1-1 at 3.)

Hinton avers that Defendants "repeatedly placed [him] in solitary confinement without any objective assessment of whether he posed a security risk to other prisoners or staff."[4] See

---

[3] The "SMU" is the DOC's "Special Management Unit," which is "designed for inmates who have chronic and serious behavioral issues not driven by a diagnosed mental illness." See Bracey v. Sec'y Pa. Dep't of Corr., 686 F. App'x 130, 134 (3d Cir. 2017) (unpublished). The SMU's program has been described as follows:

> [T]he SMU is a structured program that provides for progression through a series of five phases, from Phase V to Phase I, at which point the inmate is returned to the general prison population. Progression from one phase to the next is accomplished by compliance with specified goals and is rewarded by additional privileges. The intent of the program is to provide security for both staff and inmates while at the same time giving inmates with a long history of behavioral problems various incentives to modify their behavior. The program functions to prepare such inmates for reintegration into the general prison population.
>
> Some inmates begin their time in the SMU at Phase IV, but most begin at Phase V. Inmates in Phases III, IV, and V are under restrictive regimes: they are placed under strict security and control practices; they have short exercise periods; and they have limited access to their own personal property. . . . At Phase I, an inmate was returned to the general population, with all privileges except that [their] movements [would] be controlled and monitored.

See Sutton v. Rasheed, 323 F.3d 236, 241–42 (3d Cir. 2003), as amended (May 29, 2003) (alterations in original) (internal quotation marks omitted).

[4] It appears that Hinton associates his placement in the RHU with being placed in "solitary confinement." See, e.g., (id. at 5 (discussing placement in the "RHU/SMU/[Long-Term Segregation Unit ("LTSU")] i.e. [sic] 'solitary confinement[']")).

(id. at 5).  He avers that his placement in the RHU "deprived him of access to services, program opportunities, and other activities accorded to general population inmates."  See (id.).  In addition, Hinton believes that placement in the RHU, SMU, and LTSU, "implys [sic] to parole . . . that [he] is continually misbehaving and needs to be kept in level 5 security housing."  See (id.). He also points out that the DOC's "Access to Mental Health Care Policy explicitly states" that placement in "solitary confinement" "could increase the potential for suicide due to the inherent stress of such confinement."  See (id. (citation omitted)).

Hinton avers that Defendants were members of the Program Review Committee ("PRC") and "responsible for implementation and oversight of the policies and practice governing SCI Rockview, including those policies and practices pertaining to solitary confinement and the RHU, disciplinary proceedings and punishment, medical and mental health care, staffing, and suicide prevention."  See (id. at 6).  Defendants were also responsible "for oversight of the RHU, including review of the appropriateness of placement in the RHU for individual prisoners."  See (id.).  They further instructed their "subordinates to abide by such policies and practices and prohibited mental health staff from speaking with prisoners in solitary confinement for more than 1-2 minutes at a time through solid steel doors."  See (id.).  Overall, Hinton asserts that Defendants "participated in the culture of abuse that thrived in the solitary confinement units at SCI Rockview[,] authoriz[ed] and permit[ed] excessive use of force, deprivation of basic human needs, and deprivation of mental health care for prisoners in solitary confinement."  See (id.).

After being confined in the RHU, Hinton had two (2) administrative custody hearings on June 10, 2020, and November 25, 2020, pertaining to his continued confinement in the RHU. (Id. at 6–7.)  Hinton alleges that these hearings violated the DOC's policies and procedures as well as his due process rights because: (1) no evidence providing a legitimate reason to continue

his detention in the RHU was presented during the hearings, (2) he was "ambushed" at the hearings because he did not receive prior notice of the charges against him, (3) the reasons for his continued confinement in administrative custody were not explained to him, and (4) he was not permitted to have "representation or witness in his defense."  See (id.).  Hinton notes that unlike what transpired with his hearing on June 10, 2020, he was served with notice of an "Other Report" during the evening after the hearing on November 25, 2020.  See (id. at 7).  In addition, on December 15, 2020, Hinton received the PRC's "Decision and Rationale" form, which he indicates was "essential to filing . . . his appeal."  See (id.).[5]

Hinton avers that he was provided with a "90[-]day review" form dated September 30, 2020, showing that Houser, Miller, Rivello, and the PRC made a "pre-determined decision [to] transfer[ him] to the LTSU Program without affording him an administrative hearing . . . ."  See (id. at 7–8).  Hinton also complains that the PRC failed to show by a preponderance of the evidence that he should remain confined in the RHU and provide an "individualized independent assessment and consideration of [his] case . . . ."  See (id.).  Instead, the PRC used "rote recitations of bald and vauge [sic] conclusory statements such as 'PRC will continue AC status,' which . . . are used on all inmate review hearing reports."  See (id.).

Hinton alleges that his "'non-disciplinary' confinement" was imposed in retaliation for him "incurring misconduct against a correctional officer."  See (id.).  He believes that he was "deliberately extracted . . . from the SMU Program[,] which was operational within the [DOC] and [then] processed . . . in the LTSU Program[,] which was inoperational [sic] . . . [and] non-

---

[5]  Hinton alleges that "SCI Rockview's custom is not to provide 802 appeal forms in order to obstruct the appeal process."  See (id.).

existing[,] making [his] confinement indefinitely maliciously and sadistically performed by design." See (id.).

On January 14, 2021, Houser responded to an Inmate Request to Staff Member form Hinton submitted by "stating in a hostile fashion that due to [Hinton's] expired DC-141 misconduct sanctions he was confined pending A/C to the LTSU program for transfer 'indefinitely.'" See (id.). Hinton avers that this "[f]urther display[s] how DC-141 misconducts are interpreted by all staff personnel as a blemish on [his] prison record affecting his parole process." See (id.).

Hinton alleges that he remained in "solitary confinement" from April 15, 2020, until February 8, 2021, even though such confinement is "known to cause harm to psychologically vulnerable individuals like [him] on account of his mental health vulnerabilities." See (id. at 9). During this period, he was deprived "of the basic human needs of environmental stimulation, social interaction, mental health, and physical health." See (id.).

Following his stint in the RHU, Hinton "resided in general population for five months [until May 4, 2021, when his] counselor . . . informed [him] that he was a Phase 1 participant of [sic] the SMU Program [due to him] not graduating the SMU Program[,] and [he] was directed to complete a year of probation." See (id.). In response, Hinton "rebutted [his] counselor['s] notification stating that the SMU Program was terminated and how he refused to participate in a non-existence [sic] program." See (id.).

On June 30, 2021, Hinton was "moved from CA to D-Unit . . . ." See (id.). He was later charged with several "fictitious DC-141 misconducts" on July 1, 2021,[6] July 20, 2021, and July

---

[6] Hinton refers to this date as "June 31, 2021" in his complaint. See (id. at 9).

21, 2021.  <u>See</u> (<u>id.</u> at 9–10).  On July 29, 2021, two (2) non-defendant correctional officers assaulted him by "cutting his wrist intentionally with the handcuffs causing him to bleed [and] leaving a permanent scar on his wrist."  <u>See</u> (<u>id.</u> at 10).  Hinton then went on a hunger strike in which he "attempt[ed] to commit suicide" from August 1, 2021, until August 11, 2021.  <u>See</u> (<u>id.</u>).  During his hunger strike, he received a misconduct on August 4, 2021 "while being housed in the 'TBO' for self-harm."  <u>See</u> (<u>id.</u>).

Based on these factual allegations, Hinton asserts claims under 42 U.S.C. § 1983 against Defendants for violations of his (1) due process and equal protection rights under the Fourteenth Amendment to the United States Constitution, (2) Eighth Amendment right to not be subjected to cruel and unusual conditions of confinement, and (3) Eighth Amendment right not to be subjected to excessive force.  (<u>Id.</u> at 11, 14, 22, 26, 27.)[7]  For relief, Hinton seeks compensatory and punitive damages.  (<u>Id.</u> at 11, 31.)

## II.    LEGAL STANDARDS

### A.    Motion for Summary Judgment Under Federal Rule of Civil Procedure 56

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  <u>See</u> Fed. R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of material fact."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48 (1986).

---

[7]  He also asserts a separate claim for "deliberate indifference to the deprivation of basic human needs," <u>see</u> (<u>id.</u> at 26), which the Court construes as a duplicate Eighth Amendment conditions-of-confinement claim.

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law.  See id. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992).  A dispute of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  See Anderson, 477 U.S. at 257.  When determining whether there is a genuine dispute of material fact, the Court must view the facts and all reasonable inferences in favor of the nonmoving party.  See Anderson, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [their] favor.").

To avoid summary judgment, the nonmoving party may not rest on the unsubstantiated allegations of their pleadings.  When the party seeking summary judgment satisfies their burden to demonstrate the absence of a genuine dispute of material fact, the burden of production shifts to the nonmoving party, who must "go beyond the pleadings" with affidavits, "depositions, answers to interrogatories, and the like" to show specific material facts giving rise to a genuine dispute.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); id. at 328 (White, J., concurring).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citation omitted).  Instead, they must produce evidence to show the existence of every element essential to their case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  See Celotex Corp., 477 U.S. at 323; see also Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992) (explaining that since plaintiff had the burden of proof, "he must make a showing sufficient to establish the existence of every element essential to his case" (citations omitted)).

As noted <u>supra</u>, when determining whether a dispute of material fact exists, the Court must consider the evidence in the light most favorable to the non-moving party. <u>See</u> <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 588 (citation omitted). In doing so, the Court must "accept the non-movant's allegations as true and resolve any conflicts in [their] favor." <u>See</u> <u>White v. Westinghouse Elec. Co.</u>, 862 F.2d 56, 59 (3d Cir. 1988), <u>abrogated on other grounds by</u> <u>Hazen Paper Co. v. Biggins</u>, 507 U.S. 604 (1993). However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." <u>See</u> L.R. 56.1. A party cannot evade these litigation responsibilities in this regard simply by citing the fact that they are a pro se litigant because these rules apply with equal force to all parties. <u>See</u> <u>Mala v. Crown Bay Marina, Inc.</u>, 704 F.3d 239, 245 (3d Cir. 2013) (noting that pro se parties "cannot flout procedural rules—they must abide by the same rules that apply to all other litigants").

Even if the Court deems the facts in the moving party's submission to be admitted due to the nonmoving party's failure to comply with Local Rule 56.1, the Court cannot simply grant the motion for summary judgment as unopposed. Instead, the Court can only grant the motion if the Court "find[s] that judgment for the moving party is 'appropriate.'" <u>See</u> <u>Anchorage Assoc. v. V.I. Bd. of Tax Rev.</u>, 922 F.2d 168, 175 (3d Cir. 1990). The analysis for determining whether judgment is "appropriate" depends on whether the party moving for summary judgment bears the "burden of proof on the relevant issues":

> Where the moving party has the burden of proof on the relevant issues, this means
> that the district court must determine that the facts specified in or in connection

> with the motion entitle the moving party to judgment as a matter of law. Where the
> moving party does not have the burden of proof on the relevant issues, this means
> that the district court must determine that the deficiencies in the opponent's
> evidence designated in or in connection with the motion entitle the moving party to
> judgment as a matter of law.

See id. (citing Celotex Corp., 477 U.S. 317).

### B.    Section 1983

Section 1983 is the vehicle by which private citizens may seek redress for violations of

federal constitutional rights committed by state officials. See 42 U.S.C. § 1983. This statute

states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress . . . .

See id. "Section 1983 is not a source of substantive rights," but is merely a means through which

"to vindicate violations of federal law committed by state actors." See Pappas v. City of

Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting Gonzaga Univ. v. Doe, 536 U.S.

273, 284–85 (2002)). "To state a claim under § 1983, a plaintiff must allege the violation of a

right secured by the Constitution and laws of the United States, and must show that the alleged

deprivation was committed by a person acting under color of state law." West v. Atkins, 487

U.S. 42, 48 (1988).

## III.    DISCUSSION

Defendants move for summary judgment on all causes of action asserted against them in

Hinton's complaint. Before analyzing the merits of this motion, the Court will address Hinton's

"Motion to Accelerate Hearing on Motion for Summary Judgment" (Doc. No. 54) and his request

to have certain of his preliminary-objection-titled submissions treated as a motion for summary judgment (Doc. No. 32-1).

### A.    Hinton's "Motion to Accelerate Hearing on Motion for Summary Judgment"

Hinton filed a "Motion to Accelerate Hearing on Motion for Summary Judgment" (Doc. No. 54); however, he never filed a brief in support of the motion in accordance with the Local Rules.  See M.D. Pa. L.R. 7.5 ("Within fourteen (14) days after the filing of any motion, the party filing the motion shall file a brief in support of the motion .... If a supporting brief is not filed within the time provided in this rule the motion shall be deemed to be withdrawn."). Therefore, the Court will deem this motion withdrawn.

### B.    Hinton's Request that the Court Treat Certain Preliminary-Objection-Titled Submissions as a Motion for Summary Judgment

Hinton requests that the Court "construe [his] 'Brief in Opposition to Defendant's [sic] Preliminary Objections, Preliminary Objection to Strike Defendants' Preliminary Objection and [the] Immunity Defense' as a brief for summary judgment sur [sic] no genuine dispute to any material fact stands and the movant is entitled to judgment as a matter of law."  See (Doc. No. 32-1 (citing Fed. R. Civ. P. 56(b)).  In considering this request, the Court recognizes the need to "remain flexible, especially 'when dealing with imprisoned pro se litigants . . . .,'" see Vogt v. Wetzel, 8 F.4th 182, 185 (3d Cir. 2021) (quoting Mala, 704 F.3d at 244–45), as well as the Court's obligation to "contru[e], administer[], and employ" the Federal Rules of Civil Procedure, "to secure the just, speedy, and inexpensive determination of every action and proceeding."  See Fed. R. Civ. P. 1.  The Court is equally mindful that pro se litigants such as Hinton "'cannot flout procedural rules—they must abide by the same rules that apply to all other litigants.'"  See Vogt, 8 F.4th at 185 (quoting Mala, 704 F.3d at 245).  After considering these principles, the Court will

deny Hinton's request.  Moreover, even if Court considered Hinton's collective submission as a motion for summary judgment, it would deny the motion.

The Court will not construe Hinton's collective submission as a motion for summary judgment because it does not comply with the Federal or Local Rules for such a motion.[8] Importantly, his submission does not comply with the Local Rule for filing a motion for summary judgment because he did not file a separate statement of undisputed material facts.  See M.D. Pa. L.R. 56.1 ("A motion for summary judgment . . . shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried. . . . Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements.").  This Local Rule is:

> essential to the Court's resolution of a summary judgment motion.  As the district court observed in Ziller v. Emerald Art Glass, "[t]he purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions . . . by organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side proposed to prove a disputed fact with admissible evidence." [No. 05-cv-00082], 2006 WL 2853976, at *1 (W.D. Pa. Oct. 4, 2006) (quotations omitted). Moreover, it is the moving party's burden, not the Court's, to identify those parts of the record that support its contention that there are no genuine issues of material fact.  The failure to comply with Local Rule of Court 56.1, therefore, frustrates the Court's ability to decide a motion for summary judgment in an efficient and orderly manner.

See Kramer v. Peerless Indem. Ins. Co., No. 08-cv-02096, 2010 WL 11553711, at *1 (M.D. Pa. Apr. 21, 2010) (first and second alterations in original).  Accordingly, "[s]tanding alone, failure

---

[8]  As indicated above, Hinton merely resubmitted previously filed documents (Doc. Nos. 19–21), one of which (Doc. No. 20), the Court already denied.  The only difference between Hinton's original filings and his collective submission is that his documents now contain citations to his newly submitted "Exhibit 14" (Doc. No. 32-2) at the end of certain sections.  See, e.g., (Doc. No. 32 at 8, 16, 19, 23, 26, 28, 34).  On each occasion, Hinton states: "Exhibit-14 Defendant's [sic] Answers to Plaintiff's Interrogatories Questions 1-19 for further review."  See (id.).

to file the separate statement of material facts required by Local Rule 56.1 is sufficient reason to deny a motion for summary judgment." See State Farm Fire & Cas. Co. v. Stuby, No. 21-cv-02050, 2024 WL 922986, at *1 (M.D. Pa. Mar. 4, 2024) (citing Davila v. Pennsylvania, No. 11-cv-01092, 2016 WL 873237, at *7 (M.D. Pa. Jan. 20, 2016), report and recommendation adopted sub nom. Davila v. Commw. of Pa., 2016 WL 861884 (M.D. Pa. Mar. 7, 2016)); see also Gomez v. Cullen, No. 21-2776, 2022 WL 1183713, at *3 (3d Cir. Feb. 24, 2022) ("[I]t is within the district court's purview to mete out appropriate penalties when a party has not complied with a local rule." (citing Weitzner v. Sanofi Pasteur Inc., 909 F.3d 604, 613–14 (3d Cir. 2018))); Weitzner, 909 F.3d at 613 ("The District Court is in the best position to determine the extent of a party's noncompliance with Local Rule 56.1, as well as the appropriate sanction for such noncompliance.").

Hinton's failure to file a separate statement of undisputed material facts is particularly problematic here because he filed an unsworn/unverified complaint and does not cite to any evidence in the record to support several of his allegations. See Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be genuinely disputed must support the assertion by: **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or **(B)** showing that the materials cited do not establish the . . . presence of a genuine dispute . . . .").  For example, Hinton alleges in his complaint that Defendants "prohibited mental health staff from speaking with prisoners in solitary confinement for more than 1–2 minutes at a time through solid steel

doors." <u>See</u> (Doc. No. 1 at 6). Yet, at no point in his collective submission does Hinton cite to evidence in the record to support this allegation.[9]

The contents of Hinton's submission also fail to satisfy the summary judgment standard. It includes requests for relief that are unavailable through a plaintiff's motion for summary judgment, such as requests that the Court strike Defendants' affirmative defense of qualified immunity, <u>see</u> (Doc. No. 32 at 1–2, 8), and dismiss their affirmative defense relating to his alleged failure to exhaust his administrative remedies, <u>see</u> (<u>id.</u> at 10–16). It also contains numerous references to the standards applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) and preliminary objections under Pennsylvania state law,[10] <u>see</u> (<u>id.</u> at 1, 3–4, 8, 9–10, 35), but does not appear to include any references to the standard applicable to motions for summary judgment or arguments about why the Court should enter summary judgment in his favor on any or all of Hinton's claims. <u>See, e.g.</u>, (Doc. No. 32 at 35 ("Here, Plaintiff's complaint states five cognizable claims against the Defendants, providing sufficient facts for purposes of imposing punitive damages against them.").

If the Court granted Hinton's request, it would relieve him from taking the appropriate steps to prosecute his own case after having been provided with ample instructions at the outset

---

[9] The only evidence Hinton cites to in his collective submission is the exhibits he filed along with his complaint (Doc. Nos. 1-1–1-9), his original preliminary-objection-themed filings (Doc. No. 20), and his collective submission (Doc. No. 32-2), none of which support these types of allegations in Hinton's complaint.

[10] Preliminary objections in the nature of a demurrer under Pennsylvania Rule of Civil Procedure 1028(a)(4) operate similarly to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) insofar as they challenge the legal sufficiency of a pleading. <u>See</u> <u>Jones v. Varner</u>, No. 923 C.D. 2024, 2025 WL 1922444, at *8 n.12 (Pa. Commw. Ct. July 14, 2025) (explaining that "a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) . . . is procedurally similar to a demurrer and which also requires all well-pleaded factual averments to be accepted as true" (citations omitted)).

16

of this litigation to guide him and allowing more than enough time to him to file a proper motion

for summary judgment.[11]  The Court denied his "Preliminary Objections to Strike Defendants

[sic] Preliminary Objection and the Immunity Defense" and explained that his other preliminary-

objection-themed submissions were improper, yet, Hinton merely recopied or refiled his prior

submissions with minor changes and requested in a letter that the Court treat two (2) of them as a

"brief for summary judgment."  Thus, despite recognizing that he needed to file a motion for

summary judgment, Hinton made virtually no effort to modify the documents to conform to the

standards for summary judgment.  Indeed, his only modifications consist of adding general

references to his new Exhibit 14, but without any citations to specific portions of Exhibit 14 or

explanations as to how Exhibit 14 supports his claims in this case.  Essentially, Hinton leaves it

to the Court to evaluate Exhibit 14 to discern how it supports his claims.  Even acknowledging

the limitations on a pro se incarcerated litigant, the Court is unable to find that Hinton's

submission is adequate under the Rules.

---

[11]  Upon the docketing of Hinton's complaint, the Clerk of Court sent him a document titled,
"Instructions for Filing a Complaint by Pro Se Prisoners" (Doc. No. 5-2), which included, inter
alia, the following notice:

> Pro se prisoners must comply with the Federal Rules of Civil Procedure, the Federal
> Rules of Evidence, and the Local Rules of Court.  Included with this packet are
> copies of the rules of procedure that arise most often in pro se prisoner civil cases.
> Although this packet includes copies of certain rules for your reference, you are
> responsible for reviewing and following all of the Federal Rules of Civil Procedure,
> the Federal Rules of Evidence, and the Local Rules of Court.

See (id. at 3).  As indicated in this notice, the Clerk of Court provided Hinton with copies of
numerous Federal Rules of Civil Procedure and the Court's Local Rules.  See (Doc. No. 5-3).
Among those Federal and Local Rules copied for Hinton were: (1) Federal Rule of Civil
Procedure 7, which covers the allowable pleadings and the proper form for motions; (2) Federal
Rule of Civil Procedure 12, which provides for defenses and objections; (3) Federal Rule of Civil
Procedure 56, which addresses motions for summary judgment; and (4) Local Rule 56.1, which
governs motions for summary judgment.  (Id. at 6, 7, 9–10, 12–14.)

Hinton's reason for his request is also insufficient.  In his letter, which was dated July 18, 2023, he indicated that he was "currently in solitary confinement for a retaliatory transfer" and had "limited access to optimize the law library."  See (Doc. No. 32-1 at 1).  Presuming that Hinton accurately represents his incarceration status on July 18, 2023, he does not attempt to explain why he could not have prepared a proper motion for summary judgment during the preceding months, and he does identify the period in which he was in solitary confinement.[12]

Overall, Hinton has not provided sufficient justification for the Court to treat his collective submission as a motion for summary judgment, and the submission itself is insufficient to be deemed a motion for summary judgment.  However, even if the Court considered the collective submission as a motion for summary judgment, the Court would deny it because, inter alia, Hinton has not complied with Local Rule 56.1, he has not identified the portions of the record demonstrating the absence of a genuine issue of material fact on his causes of action, see Celotex Corp., 477 U.S. at 323–24, and many of the allegations in his complaint are unsupported by citations to evidence in the record.  See Postie v. Frederick, No. 14-cv-00317, 2018 WL 1750758, at *2 (M.D. Pa. Jan. 11, 2018) (explaining that "[u]nsupported assertions, conclusory allegations, or mere suspicions" are insufficient to support a motion for summary judgment), report and recommendation adopted, 2018 WL 1744598 (M.D. Pa. Apr. 11, 2018) (citation omitted).  Hinton's collective submission fails to meet his burden of showing, based

---

[12]  It is unlikely that Hinton could support an assertion that he remained in solitary confinement during most of the prior months considering that he filed another civil action in this Court in which he alleges that he was transferred from SCI Rockview to Pennsylvania State Correctional Institution Camp Hill in September 2022 and was in general population there until approximately June 10, 2023.  See Hinton v. Salamon, No. 23-cv-01686 (M.D. Pa. filed Oct. 11, 2023), ECF No. 1 at 8–9.  Moreover, the exhibits Hinton attaches to his collective submission as Exhibit 14 are dated in December 2022, so they were available for him to specifically discuss in a motion for summary judgment.  (Doc. No. 32-2.)

upon the pleadings, depositions, answers to interrogatories and other information of record, that

there is no genuine issue of material fact and that he is entitled to judgment as a matter of law on

any of his causes of action asserted in his complaint.  This would preclude the Court from

granting summary judgment in his favor even if his collective submission was considered as a

motion for summary judgment.  See Fed. R. Civ. P. 56(c).[13]

### C.    Defendants' Motion for Summary Judgment

#### 1.    Factual Record[14]

##### a.    Hinton's Incarceration at SCI Rockview

Hinton has been in DOC custody since 2013 while serving a sentence of a minimum of

fifteen (15) years to a maximum of thirty (30) years' state incarceration.  See (Doc. No. 45-2 at

7); Commonwealth v. Hinton, No. 1531 EDA 2018, 2019 WL 1968226, at *1 (Pa. Super. Ct.

May 1, 2019) ("On March 22, 2013, the trial court sentenced Appellant to an aggregate term of

15 to 30 years' incarceration followed by 10 years' probation."); see also (Doc. No. 1 at 7).  In

2019, Hinton was transferred to SCI Rockview to complete "phase one" of the "SMU program."

See (Doc. No. 45-2 at 8–9); see also (Doc. No. 1 at 4).[15]

---

[13]  To the extent that Hinton fails to support his factual allegations in his complaint, the Court
recognizes that the Court may give him "an opportunity to support or address the fact . . . ."  See
Fed. R. Civ. P. 56(e).  Hinton will not be provided with such an opportunity in this case because,
as explained below, even if he provided evidentiary support for his allegations in his complaint,
they would not entitle him to summary judgment on any of his legal claims in this case.

[14]  Because Hinton did not respond to Defendants' statement of undisputed facts, the Court
considers the facts therein to be undisputed for purposes of resolving their motion.  See M.D. Pa.
L.R. 56.1.  Nevertheless, the Court also considers the entirety of the record in determining
whether summary judgment in Defendants' favor is appropriate, due in part to the fact that
Defendants' statement consists of only seven (7) numbered paragraphs.  (Doc. No. 45.)

[15]  Hinton testified during his deposition that "SMU" stands for the "Security [M]anagement
[U]nit," which is a "[s]pecial housing program" intended "to basically rehabilitate a person."

Hinton was incarcerated in general population at SCI Rockview prior to April 15, 2020. (Doc. Nos. 45 ¶ 1; 45-1 at 3.) On that date, "CO1 Kimberly" issued a misconduct report against Hinton charging him with the following Class One offenses: (1) threatening an employee with bodily harm; (2) using abusive, obscene, or inappropriate language to or about an employee; (3) refusing to obey an order; and (4) presence in an unauthorized area. See (Doc. No. 1-1 at 3). These charges were based on the following narrative:

> On [April 15, 2020, at approximately 1:05 p.m.], I CO1 Kimberly while clearing 4 front ordered inmate Hinton (KY949) & multiple other inmates to clear off 4 front. Upon coming down to 3 range back I discovered inmate Hinton halfway down the range. I walked down the range and ordered the inmate to tell me what cell he lived in and to take it in. I informed him[] that he was being escorted to his cell for running around. Inmate became verbally aggressive, swinging his arms and ignored all orders to identify himself and what cell he lived in. Inmate became more aggressive[,] turning on this officer on the 5 range stops, and verbally threatening. Inmate stated "what are you going to do, and back the fuck off, you white bitch[es] are going to fucking learn." I ordered the inmate multiple more times to return to his cell, and that I was escorting him there.
>
> . . .
>
> Inmate then started up 5 range steps stopping halfway up stating, "Yo, back the fuck off, I ain't no fucking kid." I again ordered the inmate multiple times to turn back around and go to his cell. I was escorting him there. He continued escalated verbal aggression stopping again on 5 back "warning me that I needed to back off there [sic] was an officer on his range." I again ordered the inmate to continue to his cell. Inmate went to his cell and attempted to slam CO1 Marlett's hand in the door. Officer Marlett quickly pulled his hand away from the door barely avoiding his hand being crushed by the inmate.

See (id. at 3–4).

The misconduct charges resulted in Hinton's placement in pre-hearing confinement in the RHU until his misconduct hearing. (Doc. Nos. 1-1 at 3, 4; Doc. No. 45-2 at 11.) It appears that

---

See (Doc. No. 45-2 at 9). As indicated above, SMU refers to the DOC's "Special Management Unit." See Bracey, 686 F. App'x at 134.

Hinton's misconduct hearing occurred on April 20, 2020, and he received a sanction of sixty (60) days in the RHU.  See (Doc. No. 45-2 at 11, 13, 16, 22, 35); see also (Doc. No. 1 at 4).

Hinton describes the RHU as containing multiple cells and other inmates.  See (Doc. No. 45-2 at 12–13).  Even though there were other inmates in the RHU, Hinton did not have a cellmate because of his "Z Code."[16]  See (id.).  Hinton asserts that he was permitted to exercise for one (1) hour each day while in the RHU.  (Id. at 13.)  In addition, Hinton claims that despite being on the wait list to receive vocational training for said training prior to his placement in the RHU, he was denied vocational training and was not allowed to attend Islamic religious services as was his routine on Friday.  (Id. at 17, 18.)  According to Hinton, he could only speak to anyone while in his RHU cell when someone was outside the steel door into his cell, and those conversations lasted "for two or three minutes at most."  See (id. at 19).  Hinton also claims that he suffers from mental health issues such as anxiety, paranoia, and depression, and those issues were "exacerbated" by being confined in his cell for "lengthy hours."  See (id.).

On June 17, 2020, the PRC held an administrative hearing addressing Hinton's confinement in the RHU.  (Doc. Nos. 1-2 at 2; 32-2 at 35; 45 ¶ 3; 45-2 at 20; 45-6 at 2.) Members of the PRC included Miller, the Corrections Classification Program Manager, Houser, the Deputy Superintendent of Centralized Services, and Rivello, the Deputy of Facilities Management, Unit Manager Mike Knapp, Psychological Service Specialists Adam Harshbarger

---

[16]  It appears that a "Z Code" is a housing classification that would allow an inmate to not have a cellmate while incarcerated.  See, e.g., Horan v. Gross, No. 22-cv-01166, 2024 WL 115798, at *2 (M.D. Pa. Jan. 10, 2024) (describing meaning of Pennsylvania state inmate's Z Code).

and Jill Fetterof, Corrections Counselor Tiarra Moore, and SCI Rockview's psychiatrist, Dr.
Doug Weber.  (Doc. Nos. 1-2 at 2; 32-2 at 34, 35; 45 ¶ 3; 45-2 at 21; 45-6 at 2.)[17]

The PRC recommended the continuation of Hinton's custody in the RHU "pending SMU
[r]eturn."  See (Doc. No. 1-2 at 2).  The PRC processed Hinton for reentry into the SMU because
he incurred additional misconducts while in SMU Phase 1.  (Doc. Nos. 32-2 at 7, 39; 45-9 at 3.)
A DC-141, Part III Program Review Committee Action form ("PRC Action Form") signed by
Defendants was issued corresponding to this decision.  See (Doc. No. 1-2 at 2; 45-9 at 3).  This
form indicates that Hinton chose to "[r]espond orally" to the PRC's decision to keep him in the
RHU.  See (Doc. No. 1-2 at 2).  The form further indicates that Hinton could "appeal the PRC's
decision to the Facility Manager within 2 days of the completion of the hearing."  See (id.).

Hinton claims that he was not informed of his right to appeal from the decision "and
contest and give them reasons of why I was being sent to do the LTSU program."  See (Doc. No.

---

[17]  The PRC's responsibilities include: (1) serving as "the first level of appeal to any
misconducts"; (2) "meet[ing] weekly in the RHU and conducting initial 802 AC (Administrative
Custody) Hearings for those placed on AC status from the prior week"; (3) "review[ing] the
status of each inmate in AC status every week for the first two months"; (4) "conduct[ing] 90-
day review meetings with any inmate confined to the RHU for 90[]days, and every 90[]days
thereafter"; (5) "review[ing] inmate requests for privileges (radios, tablet, TV, commissary,
phone calls, visitation, etc.) while confined to the RHU"; (6) "meet[ing] with any inmate who
makes a request for an out of cell contact"; (7) "mak[ing] weekly administrative tours of the
RHU and mak[ing] contact (cell side) with any inmate who refuses to attend a scheduled PRC
meeting"; (8) "review[ing] inmates for possible transfer to other facilities due to separation needs
or administrative needs"; (9) "review[ing] inmates for possible specialized program referrals,
Behavior Management Unit (BMU), Secure Residential Treatment Unit (SRTU), Security Threat
Group Management Unit (STGMU), Mental Health Unit (MHU), Intermediate Care Unit (ICU),
Restricted Release List (RRL), Protective Custody Unit (PCU), etc."; (10) serving as "the first
level of appeal to . . . a specialized unit recommendation"; (11) "respond[ing] to inmate
grievances from the RHU"; (12) "ensur[ing] appropriate out of cell time is being provided to
include structured and unstructured activities and review[ing] inmate participation daily"; and
(13) "consider[ing] and approv[ing] any early release from a DC (Disciplinary Custody) sanction
and make appropriate housing placements upon release from the RHU."  See (Doc. Nos. 32-2 at
35, 40; 45-6 at 2; 45-7 at 3).

45-2 at 22).  Hinton also complains that he was unable to have his counselor at the hearing because "he would have been able to basically explain [Hinton's] character . . . [and] progress . . . ."  See (id. at 23).  Hinton does not believe that his counselor would have approved his return to a special housing unit program.  (Id. at 24.)

As of June 2020, there were twenty-three (23) inmates—sixteen (16) new placements and seven (7) SMU Phase 1 returns—on a waiting list for the SMU Program.  (Doc. Nos. 32-2 at 6; 45-9 at 2.)  This waiting list "was for two facilities, SCI-Forest and SCI-Fayette."  See (Doc. Nos. 32-2 at 6; 45-9 at 2).  Other than the SMU, the DOC had the following available Special Housing Unit Programs in 2020: (1) the STGMU; (2) the BMU; (3) the SRTU; (4) the ICU; (5) the PCU; (6) the Positive Outcome Restructuring Through Assessments & Learning (PORTAL); (7) Long Term Segregation; and (8) the Special Observation and Assessment Unit.  (Doc. Nos. 32-2 at 3, 7, 12; 45-9 at 3.)

The PRC, acting through Rivello, Houser, and Miller, conducted a "90 Day Review" of Hinton's custody in the RHU on September 30, 2020, as evidenced by a DC-141, Part 4 Form. See (Doc. Nos. 1-2 at 3; 45-3 at 7).  The PRC recommended that Hinton should "[c]ontinue DC status . . . [p]ending LTSU Placement."  See (Doc. Nos. 1-2 at 3; 45-3 at 7).  By this time, an announcement was made about the closure of the SMU Program, which was the reason for Hinton's recommended placement with the LTSU, a similar specialized behavior program that was to replace the SMU.  (Doc. Nos. 32-2 at 2, 6, 7, 23, 39–40; 45-8 at 4.)  Defendants told Hinton that the SMU Program was no longer in existence, and he would be transferred to the LTSU.  (Doc. No. 45-2 at 10, 11, 17, 20.)

Hinton was recommended to the LTSU Program instead of other Special Housing Unit ("SHU") programs because:

> [He] was previously in the [SMU]. He transferred to SCI-Rockview in order to complete Phase 1 of the SMU program in general population. Due to three misconducts: On 2/13/20 he incurred Class 1 convictions for Using Abusive Obscene or Inappropriate Language, Lying to an Employee, and Presence in an Unauthorized [A]rea. He was subsequently given a 30-day Cell Restriction sanction. Then, on 4/15/20 he incurred Class 1 convictions for Using Abusive, Obscene or Inappropriate Language, Refusing to Obey an Order and Presence in an Unauthorized Area. He was subsequently given a 60-day Disciplinary Custody sanction. Lastly, on 4/19/20 he incurred a Class 1 conviction for Lying to an Employee and subsequently sanctioned to 30-day Disciplinary Custody. These misconducts led the SCI-Rockview [PRC] to recommend his return to the SMU for additional treatment programming. However, . . . the SMU program [was] going through a closure process and therefore [the PRC] would need to recommend the proposed replacement program for the SMU, which [Houser] recalls being the LTSU.

See (Doc. Nos. 45-8 at 3); see also (Doc. Nos. 45-2 at 17; 32-2 at 23 ("Mr. Hinton did not successfully complete the SMU program Phase 1. He could not be returned to the SMU as a SMU Phase 1 failure."); id. at 29 ("Hinton was a SMU phase 1 failure . . . and had an extensive history of aggression towards staff and inmates. PRC determined at the time that he was appropriate for LTSU . . . .")). The goal of placing Hinton in the LTSU Program was "for him to learn and utilize cognitive behavior modification skills which would enable him to reside in a DOC general population in a prosocial manner, which he had failed to do as a SMU Phase 1 person." See (Doc. No. 32-2 at 18; 45-8 at 3); see also (Doc. No. 32-2 at 29 ("The goal was improved behavior and eventual release to population because . . . Hinton was threatening staff and had poor adjustment."). Hinton's mental health was taken into consideration when deciding to place him in the LTSU Program. (Doc. Nos. 32-2 at 17–18, 23, 29; 45-8 at 3–4.)

Hinton had another administrative custody hearing on November 25, 2020. (Doc. No. 45-2 at 24.) Through a DC-141 Part 1 form dated on the same date, and designated as

"OTHER," "Hinton was placed on Administrative Custody status pursuant to Administrative Directive 802, Section 1, B, 1a, inmate is in danger by/from some persons in the facility and cannot be protected by alternate measures[,] specifically . . . Hinton is pending LTSU transfer." See (Doc. No. 1-2 at 4). Approximately one (1) week later, the PRC issued another PRC Action Form dated December 3, 2020. (Id. at 5.) This form was signed by Rivello, Houser, and Miller. (Id.) The form states that, inter alia, an Administrative Hearing was held on December 3, 2020, and Hinton's RHU custody was continued pending his transfer to the LTSU. (Id.)

The PRC, through Rivello, Houser, and Miller completed another "90 Day Review" dated December 23, 2020. See (id. at 6). The PRC decided to "[c]ontinue [Hinton's] AC status per DC-ADM 802 1.b.1.a. [sic] [p]ending LTSU Placement." See (id.). According to Houser, Hinton was continuously informed of his incarceration status through verbal discussions with numerous unit staff members and members of the PRC, including himself. (Id. at 18.) Hinton remained in the RHU "until January of 2021," when he was returned to general population. See (Doc. No. 45-2 at 22, 24).

A local DOC facility does not have final approval of any specialized program referral; instead, the PRC will often recommend whether an inmate should be referred to a special housing program. (Doc. Nos. 32-2 at 18, 40; 45-7 at 3; 45-8 at 2.) The DOC's Central Office Special Needs Psychiatric Review Team ("COSNPRT") can deny the local facility's recommendation and approve any other specialized program deemed appropriate. (Doc. Nos. 32-2 at 18; 45-8 at 2.) COSNPRT never approved Hinton's transfer into the LTSU Program because the program never opened. (Doc. Nos. 32-2 at 2, 16, 41; 45-2 at 26; 45-7 at 4; 45-8 at 2, 4.) At that point, Hinton's name was submitted for the BMU. (Id. at 23–24.)

Hinton was charged with a "fictitious" misconduct on June 31, 2021, by non-defendant Officers Bauer and Kamba.  (Doc. No. 45-2 at 27–28, 34.)  In July 2021, Hinton was charged with two "fictitious" misconducts by officers while he was "in the TBO," "a unit that [inmates] are housed in a camera cell" if they are suicidal.  See (id. at 28, 34).

### b.    The DOC's Administrative Custody Procedures

The DOC policy, DC-ADM 802, governing administrative custody procedures, was in effect at the time of the events at issue in this case.  See (Doc. No. 1-3).  Under this policy, "[a]n inmate who has completed a [Disciplinary Custody] sanction that was imposed in accordance with Department policy DC-ADM 801, "Inmate Discipline" may be placed in "[Administrative Custody] status" for several reasons, including, inter alia: (1) "verifiable and documented justification exists for placement"; (2) "the inmate is an obvious target for other inmates, consistent with the definition of [Protective Custody or]; (3) "staff have made every effort (documented) to keep the inmate safely housed in general population." See (id. at 6–7). However, the inmate is entitled to a hearing conducted by the PRC before being placed in Administrative Custody.  (Id. at 7, 9.)

The PRC's reasons for confining the inmate in Administrative Custody "must be explained to the inmate in writing and the inmate must be provided with the DC-141, Part 1, Other Report."  See (id. at 9 (emphasis omitted)); id. at 10 ("The rationale for the [Administrative Custody] placement shall be read and explained to the inmate.")).  In addition, the inmate "shall be permitted to respond to the rationale for [Administrative Custody] placement . . . orally or in writing."  See (id. at 10).

When reaching a decision, the PRC must base it "on some evidence as to whether a valid security reason exists to confine the inmate in [Administrative Custody] as defined in [DC-ADM

802 § 1].” <u>See</u> (<u>id.</u> (emphasis omitted)).  The PRC must also provide a written summary of the hearing using the DC-141, Part 3, PRC Action form, which “shall include the reason(s) relied upon by the PRC to reach its decision.”  <u>See</u> (<u>id.</u> (emphasis omitted)).  “A copy of the written summary shall be provided to the inmate.”  <u>See</u> (<u>id.</u>).

If an inmate is dissatisfied with the PRC’s decision “concerning [their] initial confinement in [Administrative Custody],” they may submit a written appeal to “the Facility Manager/designee within two work days of the completion of the hearing.”  <u>See</u> (<u>id.</u> at 11 (emphasis omitted)).  The Facility Manager/designee then has “ten calendar days” from receipt of the appeal to forward a decision to the inmate.  <u>See</u> (<u>id.</u> (emphasis omitted)).  If the inmate is dissatisfied with the Facility Manager/designee’s decision, they may appeal to the Office of the Chief Hearing Examiner within “seven calendar days” after receiving the decision.  <u>See</u> (<u>id.</u>).  “The Office of the Chief Hearing Examiner will review the record of the hearing and all other relevant documents and rule on the appeal within two work days after its receipt.”  (<u>Id.</u>)

After an inmate’s first sixty (60) days in Administrative Custody, “the PRC shall interview” the inmate “unless the Unit Management Team recommends an earlier review.”  <u>See</u> (<u>id.</u> at 12 (emphasis omitted)).  “The PRC’s decision to continue the inmate in AC status or release [them] to population should be documented on a DC-141, Part 4, Facility Manager’s Review with a copy provided to the inmate.”  (<u>Id.</u> (emphasis omitted)).  “If the PRC decides to continue the inmate in [Administrative Custody] following a 90-day review, the inmate may appeal [their] continuation using the same procedures” as appealing from initial placement in Administrative Custody.  <u>See</u> (<u>id.</u>).

If the PRC recommends the transfer of an inmate to a SHU, “the PRC shall review the recommendation with the inmate and inform [them] of the reason(s) for the transfer

recommendation." See (id.).  The recommendation must be documented on the DC-141, Part 4 form, and a copy must be given to the inmate.  (Id.)  The inmate must "be given the opportunity to respond in writing to the rationale given and object to [their] placement in a [SHU], if [they] so desire[]."  See (id. (emphasis omitted)).  If the inmate is dissatisfied with the recommendation to place them in a SHU, they may appeal using the procedure outlined above.  (Id.)

### c.    The DOC's Inmate Grievance Process

The DOC policy, DC-ADM 804, governing the inmate grievance process, has been in effect since May 1, 2015.  See DC-ADM 804, available at https://www.pa.gov/content/dam/copapwp-pagov/en/cor/documents/about-us/doc-policies/804%20Inmate%20Grievances.pdf (last visited September 16, 2025).[18]  When inmates have a concern, they are expected to submit a grievance within fifteen (15) working days after the event giving rise to their concern.  See id. § 1(A)(5), (8).  Following the submission of a grievance, it is assigned to a staff member for Initial Review.  See id. § 1(C)(3).  After Initial Review, the inmate can appeal the response they received to the Facility Manager.  See id. § 2(A)(1)(a).  After the Facility Manager responds, a dissatisfied inmate can appeal that response for Final Review to the DOC Secretary's Office of Inmate Grievance and Appeals ("SOIGA").  See id. § 2(A)(2), (B)(1).

---

[18] The Court takes judicial notice of the DOC's three-tiered inmate grievance procedure as set forth in DC-ADM 804, as it is publicly available on the DOC's website.  See Vanderklok v. United States, 868 F.3d 189, 205 n.16 (3d Cir. 2017) (taking judicial notice of Department of Homeland Security's administrative program because it "is publicly available on government websites"); Blair v. Carl, No. 24-cv-00211, 2024 WL 3850444, at *8 n.6 (M.D. Pa. Aug. 15, 2024) (taking judicial notice of DC-ADM 804.2 (citing Spruill v. Gillis, 372 F.3d 218, 232 (3d Cir. 2004))).

### d.    Hinton's Grievances[19]

### (1)    Grievance No. 897737

Hinton filed Grievance No. 897737 on November 4, 2020.  (Doc. Nos. 1-4 at 2; 45-3 at

3.)  In this grievance, Hinton stated as follows:

> On 11-04-20 I was informed by staff member Byerlee that the rationale for me
> presently being confined to the RHU is due to the fact that the SMU Program I was
> a participant of [sic] was terminated in which now am [sic] being placed into the
> LTSU Program.   This is a violation of DOC's policy DC-ADM 802 a
> "Psychological Assessment."   Please view attached document displaying that my
> last psychological assessment was dated on 3-13-19.  My relief is to be released
> into general population am [sic] no longer under the jurisdiction of the SMU
> Program.  Civil litigation will be pursued if this issue can't be resolved.

See (Doc. Nos. 1-4 at 2; 45-3 at 3).  He also indicated that he contacted "staff members, Byerlee,

Ms. Moore, Mr. Knapp, [and] Mr. Makosy" before submitting the grievance.  See (Doc. Nos. 1-4

at 2; 45-3 at 3).  The PRC's September 30, 2020 DC-141, Part 4 Form was attached to the

grievance.  See (Doc. Nos. 1-4 at 2, 3; 45-3 at 3, 4).

Unit Manager J. Alexander issued an Initial Review Response dated December 1, 2020,

in which Hinton's grievance was denied.  (Doc. Nos. 1-4 at 3–4; 45-3 at 3–4.)  The rationale for

denying the grievance was set forth as follows:

> In grievance 897737, you state that PSS Byerlee informed you that you are now
> being processed for an LTSU program, since the DOC has terminated the SMU
> program.   You claim that this is in violation of DC-ADM 802 because SCI-
> Rockview is "unlawfully" placing you into the LTSU program without performing
> an updated psychological assessment. Attached to the grievance is a DC-141, Part
> 4, dated 9/30/2020, which documents that the last psychological evaluation
> completed for you was 3/13/2019.

---

[19]  In referencing the information in Hinton's grievances and the responses to those grievances,
the Court recognizes that "while prison grievances themselves may be considered on summary
judgment as 'documents,' the statements contained therein are not competent evidence if they are
unsworn and not made under penalty of perjury."  See Travillion v. Wetzel, No. 24-1763, 2025
WL 971669, at *2 (3d Cir. Apr. 1, 2025).  As such, they are not referenced "for the truth of the
matters stated therein."  See id.

According to DOC records, you were removed from the SRTU program and placed in the SMU program at SCI-Fayette 8/31/2019. On 11/26/2019, you were transferred to SCI-Rockview to complete Phase 1 of the SMU program. A vote sheet for SMU completion was submitted in February 2020, but it was determined that Phase 1 be extended due to a misconduct (#D369031). A second vote sheet for return to SMU Phase 1 was completed and approved 6/9/2020 based upon your poor adjustment and inability to maintain misconduct free behavior while participating in Phase 1 of the SMU program. A packet was submitted to Central Office for you to return to the SMU program as a Phase 5 participant.

The DOC determined on 6/25/2020 that specialized program referrals for the SMU will no longer be processed, and that the packets that were pending approval will be reviewed for LTSU placement instead. Because you never graduated the SMU program, a new referral packet was not necessary. An updated psychological evaluation is not necessary, as the packet submitted for SMU return was retained and rerouted for LTSU placement.

Further, you state in the grievance that you were notified of the LTSU on the date that this grievance was submitted (11/4/2020); however, the supporting documentation you provided for the psychological evaluation date clearly states "Pending LTSU Placement", [sic] and is dated 9/30/2020.

As relief, you request to be released into general population and no longer under the rules of the SMU program. This relief is denied, as you have proven that you cannot be successful in general population, even under the supervision provided by the SMU Phase 1 criteria.

This grievance is denied, as SCI-Rockview followed all procedures outlined in accordance with the SMU closure and placement in the LTSU program.

See (Doc. Nos. 1-4 at 3; 45-3 at 3).

In response to this Initial Review Response, Hinton filed an appeal to the facility

manager dated December 8, 2020. (Doc. Nos. 1-4 at 5.) In this appeal, Hinton stated:

This appeal is being submitted for good cause and timely. The original grievance and relief sought is incorporated herein by reference as though fully set forth. Not although the initial response reflects 12-01-20, I did not actually receive it until 12-07-20. In accordance to [sic] Policy DC-ADM 801 asserting that a [sic] appeal cannot be placed until a response is given, in which this appeal is timely.

I originally submitted this grievance due to the fact that SCI-Rockview is unlawfully placing me into the LTSU Program without performing an [sic] psychological assessment. The initial responder implies that SCI-Rockview

followed all procedures outlined in accordance with the SMU closure and placement in the LTSU Program.

The following erects [sic] as the premise of this grievance appeal. The initial responder doesn't reject nor deflect the fact that the SMU Program I was a participant in was terminated and SCI-Rockview proceeded to enter me into the LTSU Program without performing a psychological assessment, in accordance to policy DC-ADM 802. Furthermore, the initial responder confessed that the SMU Program doesn't reflect the LTSU Program substantiating my contention that a psychological assessment should have been performed.

My relief is to be released into general population am [sic] no longer under the jurisdiction of the SMU Program. Civil litigation will be pursued if this issue can't be resolved.

See (id.).

SCI Rockview's Facility Manager, M. Garman ("Garman"), issued a Facility Manager's

Appeal Response dated January 7, 2021, upholding the denial of Hinton's grievance. (Id. at 6.)

Garman's response indicated as follows:

I have reviewed the initial grievance, the grievance officer [sic] response, and the subsequent appeal of your issues relating to your concerns with Housing [sic].

Major Haldeman [sic] adequately responded to your grievance. A review of the information provided by the grievance officer shows no violation to [sic] DOC Policy. A review of your grievance appeals provides no evidence to contradict the information provided by the grievance officer. This matter was properly addressed by the grievance officer.

Your grievance appeal is denied and any compensation requested is denied.

See (id.).[20]

Following Garman's response, Hinton submitted a "Final Review Appeal" dated January

16, 2021 to SOIGA. See (id. at 7). In his SOIGA appeal, Hinton complained as follows:

I originally submitted this grievance due to the fact that SCI-Rockview is unlawfully placing me into the LTSU Program without performing an [sic] psychological assessment. The facility manager implies that SCI-Rockview

---

[20] While ultimately irrelevant to the resolution of Defendants' motion, it appears that Garman's reference to Major Haldeman is a mistake.

followed all procedures outlined in accordance with the SMU closure and placement in the LTSU Program.

The following erects [sic] as the premise of this grievance appeal. The facility manager doesn't reject nor deflect the fact that the SMU Program I was a participant in was terminated and SCI-Rockview proceeded to enter me into the LTSU Program without performing a psychological assessment, in accordance to policy DC-ADM 802. Furthermore, the responder confessed that the SMU Program doesn't reflect the LTSU Program substantiating my contention that a psychological assessment or evaluation should have been performed.

My relief is to be released into general population am [sic] no longer under the jurisdiction of the SMU Program and the LTSU Program isn't open. Civil litigation will be pursued if this issue can't be resolved.

See (id.).

SOIGA issued a Final Appeal Decision dated February 16, 2021, in which it upheld the

denial of Hinton's grievance. (Id. at 8.) SOIGA explained its decision as follows:

You claim that on 11/4/2020, you were informed by staff that the reason for you being confined to the RHU is because the SMU program, in which you were participating, had been terminated and you are going to be placed into the LTSU program. You allege that this is a violation of DOC policy DC-ADM 802 because you are unlawfully being placed into the program without having a psychological assessment performed. You say that your last psychological assessment was 3/13/2019. You request to be released into general population.

A review of the record found that the Grievance Officer thoroughly investigated your claims and provided you with a detailed response. As stated, an updated psychological evaluation is not necessary. There is no evidence provided that policy or procedures are being violated. Your grievance and requested relief are denied.

See (id.).

### (2)    Grievance No. 904200

Hinton filed Grievance No. 904200 on December 14, 2020. (Doc. Nos. 1-4 at 9; 45-4 at

3.) In this grievance, Hinton stated as follows:

I am continuously being confined to the RHU under the guise of being processed for the LTSU Program. No reasonable rationale erects [sic] why I can't be transported to the LTSU Program. I requested on several occasions to be released

into general population in which I was rejected. My counselor Mr. Makosy informed me that the LTSU Program isn't established so my transfer remains uncertain. My mental health is declining on a daily basis. The following issues are conditions of confinement violation 8th, 14th, 15th amendment [sic] of the United States Constitution. As a remedy I would like to be released to general population, punitive damages.

See (Doc. Nos. 1-4 at 9; 45-4 at 3). He also indicated that he contacted Mr. Makosy before submitting the grievance. See (Doc. Nos. 1-4 at 9; 45-4 at 3).

This grievance was rejected via a "Rejection Form" dated December 14, 2020. See (Doc. Nos. 1-4 at 10; 45-4 at 4). The "Rejection Form" stated that the grievance was rejected because "[t]he issue(s) presented on the . . . grievance has been reviewed or is currently being reviewed and addressed. Prior 897737." See (Doc. Nos. 1-4 at 10; 45-4 at 4). Hinton did not pursue this grievance further. See (Doc. Nos. 45 ¶ 5; 45-5 at 3).

### e.    Affidavits Attached to Hinton's Complaint

### (1)    October 24, 2021 Affidavit of Tonee A. Dowell

Tonee A. Dowell ("Dowell") was first placed in the SMU at Pennsylvania State Correctional Institution Greene in approximately 1998. (Doc. No. 1-6 at 4.) Dowell claims that he has spent approximately twenty-seven (27) years "with in [sic] such: "SMU" . . . "LTSU" . . . and/or the: "RHU" facilities across the entire state of Pennsylvania." See (id. (ellipses in original)). Regarding the SMU, Dowell states that no inmate ever spent a "YEAR'S [sic] Time" on a probationary period; instead, "[s]uch periods will extend no more than: "30 CALENDAR DAYS." See (id. at 4–5). Dowell asserts that according to his "personal knowledge and experience," the LTSU program "has been abolished and/or decommissioned (discontinued)" since approximately 1995. See (id. at 5).

### (2)    September 3, 2021 Affidavit of Shawn Simms

### (a)    Issues with the Affidavit

There are several issues with Shawn Simms ("Simms")'s affidavit that preclude the Court considering it in its entirety as part of the factual background of this case.  First, the affidavit contains pages of information unrelated to Hinton's allegations in his complaint and his specific legal claims against Defendants.  Simms uses more than four (4) pages of his affidavit to complain about measures taken and not taken by SCI Rockview staff during Covid-19.  See (Doc. No. 1-8 at 1–5).  He also references an alleged incident on November 21, 2020, when Hinton was placed in a cell that was not cleaned despite "2 previous cases of Covid in that cell" and the unit not being quarantined.  See (id. at 5).  This information is irrelevant to Hinton's claims in this case because even though Hinton challenges the conditions of confinement in his complaint, there are no allegations about those conditions being unconstitutional because of the circumstances surrounding the COVID-19 pandemic or restrictions placed on SCI Rockview inmates during the pandemic.  See generally (Doc. No. 1 at 1–31).

Simms also references (1) Hinton's return to solitary confinement after spending a few months in general population following his release from the RHU, (2) Hinton being "a constant target for retaliation and guards exploit situational circumstances where they invent fictional stories of misconduct" against him, and (3) PRC "threatening him with fraudulent 141 reports to keep him in solitary confinement for years at a time."  See (id. at 8–9).  This information in Simms's affidavit is also not included in Hinton's allegations against Defendants in this case.

Second, the affidavit contains a significant amount of double hearsay evidence, the potential admissibility of which is unclear and not addressed by any party.  See (Doc. No. 1-8 at 7–9); Fraternal Ord. of Police, Lodge 1 v. City of Camden, 842 F.3d 231, 238 (3d Cir. 2016)

34

(alteration omitted) ("[H]earsay statements can be considered on a motion for summary judgment if they are capable of being admissible at trial." (quoting Stelwagon Mfg. Co. v. Tarmac Roofing Sys., 63 F.3d 1267, 1275 n.17 (3d Cir. 1995))). Simms mentions numerous purported statements by "various people" at SCI Rockview while not specifically attributing them to any specific person, much less any specific Defendant. See, e.g., (Doc. No. 1-8 at 8 ("While speaking with PRC, staff told [Hinton] that 'you should've never did all that time down here [solitary confinement] so, we are taking that into consideration.'" (alteration in original)). To the extent that it appears the hearsay referenced in Simms's affidavit is potentially admissible, the Court references it below. See McMillian v. Wetzel, 790 F. App'x 455, 459 (3d Cir. 2019) (unpublished) (determining that statements in affidavit attributable to defendants was admissible under Federal Rule of Evidence 801(d)(2) and pointing out "[n]othing suggest[ed] that [the affiant] would be unavailable to testify at trial" (citations omitted)). Nevertheless, the Court notes that even if the Court considered the entirety of Simms's hearsay statements (to the extent they are relevant to Hinton's claims), the Court's resolution of Defendants' motion for summary judgment would remain the same.

Finally, Simms does not identify the dates for several events described in his affidavit. This includes Simms indicating that the "PRC, . . . Warden, Unit Manager, and several other staff [came] to [Hinton's] cell at various times . . . telling him that he'll do a 'step-down' program followed by 6 months of probation in population." See (id. at 8). Without knowing the dates of these alleged statements to Hinton, the Court cannot discern whether the statements are relevant to the claims in this case, which concern only Hinton's confinement in the RHU from April 15, 2020 through January 2021. See (Doc. No. 45-2 at 22 (testifying that he was returned to general

population in January 2021)).  This lack of specificity is compounded by conflicting information

in the affidavit about where Simms resided during the events described therein.[21]

### (b)    Information in the Affidavit

As indicated above, Simms states that he has been in "solitary confinement" at SCI

Rockview from February 28, 2020 until the signing of his affidavit.  See (Doc. No. 1-8 at 2).

"Solitary confinement" is located on G-Block, which is composed of three units: A, B, and C.

See (id.).  Simms was housed on C-Unit until October 23, 2020, until he was moved to B-Unit.

See (id.)

Simms observed "several people get placed on 'A/C' status[, which] isn't 'punishment'

status, but [is] still solitary confinement where [they] are completely isolated without any

privileges."  See (id. at 5–6).  These "people" are placed in administrative custody "pending a

transfer[] to one program or another . . . only to be told that 'the program placement was

denied'" and then returned to general population.  See (id. at 6).  Simms claims that SCI

Rockview's PRC does this "to keep inmates confined, legally, in solitary confinement for long

---

[21]  For example, Simms states that he has been in "solitary confinement" at SCI Rockview from
"2-28-20 to [the] present date."  See (Doc. No. 1-8 at 2).  The zero in the "20" in the affidavit
appears to be written over the number "1," seemingly signifying that Simms originally wrote that
he was in solitary confinement from "2-28-21 to [the] present date" only to change the year from
"20" to "21."  See (id.).  Simms then indicates that "solitary confinement" is located on G-Block,
which is composed of three units: A, B, and C, and he points out that he was housed "on C-Unit
(within G-block) from 2-28-21 to 10-23-21," and thereafter was moved to B Unit.  See (id.)

As best the Court can discern, it appears that Simms's reference to 2021 as the year he was "on
C-Unit" is an error.  He could not have been on C-Unit until October 23, 2021, considering he
signed his affidavit on September 3, 2021 (id. at 9), almost two (2) months prior to that date.
Thus, it appears that Simms lived on C-Unit in 2020.  If so, that would mean that Simms lived
across from Hinton until October 23, 2020, and it is unclear from the affidavit how Simms heard
statements seemingly made after October 23, 2020, such as those made after Hinton was returned
to the RHU later in 2021.  See (id. at 7–9).

periods of time after their D/C (punishment status expires)." See (id.). Simms avers that this happened to him at one point, where he remained in administrative custody for four (4) months pending a transfer. (Id. at 6–7.)[22]

As for his interactions with Hinton, Simms alleges that he lived "directly across from him on C-unit and could hear most of the things he was saying/what was being said to him (when [Simms] paid attention)." See (id. at 7). Houser and Rivello were among several people who told Hinton that "he was being sent back to the SMU for violating his probation." See (id.). These same individuals "eventually let [Hinton know] that the LTSU isn't running in the DOC yet." See (id.).

Simms believes that PRC "erroneously held . . . Hinton in solitary confinement for almost an entire year" and did so "simply to 'legally' confine him in solitary confinement 'pending program placement' for no other reason than to try to cause phsychological [sic] harm." See (id.). This intent was "manifest[ed] when . . . Hinton finally won the argument and was released into population without having to do a program for which he 'violated probation.'" See (id.).

### f.    Hinton's Correspondence with John Muick

Hinton submitted a letter dated June 17, 2020 (the same date as the PRC's first administrative hearing pertaining to Hinton's confinement in the RHU) to Staff Assistant John Muick ("Muick"). (Doc. No. 1-5 at 2.) In this letter, Hinton stated in relevant part as follows:

> [I] am presently confined at SCI Rockview's RHU on "AC" status pending a verdict whether or not I'll be admitted back into the SMU Program in causation of a minor infraction, misconduct number "0428052". [sic]
>
> My counselor Mr. Makosy informed me that he honestly was reluctant to initiate a vote sheet rendering my return to the SMU Program due to the fact that my conduct hasn't been problematic[,] simultaneously I completed my probation period [sic]

---

[22] Attached to Simms's affidavit are documents he believes supports this claim. See (id. at 15).

however, he was tardy at circulating a vote sheet ramifcating [sic] the erection [sic] of COVID-19 transpiring.

Mr. Makosy professed that you may preside over the formality of arriving at a conclusion[,] so my contention resides to articulate to you that am [sic] wrong in which I take full responsibility for my actions.  I necessarily can't be upset if your decision is to recommit me into the SMU Program for a second time[.]  I caused this incident to happen.

Please may you take into consideration the unique properties of my case when rendering your judgement [sic].  Thank you for your time.

See (id.).

Muick responded to Hinton's letter via a memo dated July 15, 2020.  (Id. at 3.)  In

Muick's memo, he characterized Hinton's letter as a "request to not be returned to the SMU

program and not be transferred from SCI Rockview."  See (id.).  He responded as follows:

Mr. Hinton, although your facility's PRC has recommended a return to the SMU, no decision has been made as of this date.  You have not been approved for a transfer.  I ask that you please be patient while the circumstances of your situation are reviewed and a decision is made that will be in the best interest of your long-term status.  I encourage you to continue to meet with the PRC, when scheduled, so that you may advocate for yourself, ask any questions you may have and keep up-to-date with any changes in your situation.

See (id.).

Several months later, Hinton wrote Muick another letter.  (Id. at 4.)  This letter, dated

November 24, 2020, stated in pertinent part as follows:

I wrote you a missive previously in regard of [sic] my current plight [sic] allow me to present to you the drastic changes erecting in my circumstance.

As you know[,] the SMU Program has been terminated[.]  I no longer reside under its jurisdiction[;] however, SCI Rockview's staff personnel are proceeding to place me into the LTSU Program unlawfully ceasing to perform a psychological assessment which is a mandatory metric to administer someone into any program offered by the DOC.

I have been in limbo for a vast amount of months[,] housed in the RHU surrounded by other inmates who have tested positive for COVID-19.  I honestly believe there

is no apparent rationale for me being initiated into a new program. This entire experience has had an adverse effect on me and my family.

May you please inform me of my present status as well as pass my concerns to the appropriate authority figure who presides over the determination of my case. Thank you for your time.

See (id.).

Muick responded to Hinton's second letter through a memo dated December 11, 2020.

(Id. at 5.) In his memo, Muick stated as follows:

This is in response to your correspondence, addressed to me, with your request to not be placed into LTSU housing and your complaint that you have not been psychologically assessed for such housing.

Mr. Hinton, I reviewed your electronic case file. There are no concerns noted regarding your psychological stability. A formal evaluation was conducted less than two years ago, which falls into compliance with [DOC] policies and procedures that relate to your current housing status. In addition, I note that you were assessed at your cell door on 11/6/2020. At that time, you declined an out-of-cell session and nothing problematic about your adjustment was noted. If you wish to participate in further mental health care, I recommend that you write to the Psychology Department and request an evaluation and/or treatment.

I trust that the above information addresses your concerns.

See (id.).

## 2. Analysis

In their motion for summary judgment, Defendants argue that (1) Hinton failed to exhaust his request for monetary damages, (2) they are entitled to summary judgment on Hinton's Eighth and Fourteenth Amendment claims, and (3) they are entitled to qualified immunity. (Doc. No. 46 at 14–30.) The Court addresses each argument in turn.

### a. Failure to Exhaust Request for Monetary Damages

Defendants contend that there is no genuine issue of material fact regarding whether Hinton exhausted his request for monetary damages in this case. (Doc. No. 46 at 14–18.) They

point out that the record shows that Hinton filed two (2) grievances relating to his causes of action in his complaint.  (Id. at 18.)  Grievance No. 897734, which Defendants acknowledge Hinton fully exhausted, did not include a request for monetary damages.  (Id.)  As for Grievance No. 904200, Defendants argue that even though it contains a request for monetary relief, Hinton failed to fully exhaust it because he never appealed from the initial rejection of the grievance. The Court agrees with Defendants that there is no genuine issue of material fact regarding Hinton's failure to exhaust his administrative remedies relating to his request for monetary relief and that they are entitled to summary judgment on his request for monetary damages.

The PLRA states that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." See 42 U.S.C. § 1997e(a). Stated differently, the exhaustion of available administrative remedies is a prerequisite for a prisoner asserting a claim under Section 1983 regarding their prison conditions. See Rinaldi v. United States, 904 F.3d 257, 265 (3d Cir. 2018); see also Ross v. Blake, 578 U.S. 632, 638 (2016) (reiterating that the PLRA's "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies" (quoting Woodford v. Ngo, 548 U.S. 81, 85 (2006))); Jones v. Bock, 549 U.S. 199, 211 (2007) (stating that "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court" (citation omitted)); Booth v. Churner, 532 U.S. 731, 733–34 (2001) (stating that the PLRA "now requires a prisoner to exhaust 'such administrative remedies as are available' before suing over prison conditions" (quoting 42 U.S.C. § 1997e(a))).

"The PLRA requires proper exhaustion, meaning 'complet[ing] the administrative review process in accordance with the applicable procedural rules.'" <u>Downey v. Pa. Dep't of Corr.</u>, 968 F.3d 299, 305 (3d Cir. 2020) (alteration in original) (quoting <u>Woodford</u>, 548 U.S. at 88). "These applicable procedural rules are supplied by the individual prisons." <u>Id.</u> (citations omitted); <u>see also</u> <u>Spruill v. Gillis</u>, 372 F.3d 218, 222 (3d Cir. 2004) (stating that "the determination [of] whether a prisoner has 'properly' exhausted a claim . . . is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances"); <u>Jones</u>, 549 U.S. at 218 (explaining that "[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim"); <u>Woodford</u>, 548 U.S. at 90 (indicating that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules"). A prisoner's failure to follow a prison's procedural rules will result in a procedural default of their claims. <u>See</u> <u>Spruill</u>, 372 F.3d at 230–32 (concluding that PLRA's exhaustion requirement includes procedural default component); <u>see also</u> <u>Drippe v. Tobelinski</u>, 604 F.3d 778, 781 (3d Cir. 2010) (pointing out that <u>Spruill</u> held "that the PLRA includes a procedural default component and the determination whether a prisoner properly exhausted a claim is made by evaluating compliance with the prison's specific grievance procedures"). A procedural default may be excused, however, if the prisoner can show that the administrative remedies were unavailable to them. <u>See</u> <u>Rinaldi</u>, 904 F.3d at 266 ("The PLRA requires only 'proper exhaustion,' meaning exhaustion of those administrative remedies that are 'available.'" (quoting <u>Woodford</u>, 548 U.S. at 93)). "Available means capable of use; at hand." <u>Small v. Camden County</u>, 728 F.3d 265, 271 (3d Cir. 2013) (internal citations and quotation marks omitted). "An administrative remedy is unavailable when it 'operates as a simple dead end[,] . . . is so opaque that it becomes, practically speaking, incapable of use, or when prison

administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" Downey, 968 F.3d at 305 (alterations in original) (quoting Shifflett v. Korszniak, 934 F.3d 356, 365 (3d Cir. 2019)). "Although the availability of administrative remedies to a prisoner is a question of law, it necessarily involves a factual inquiry." Small, 728 F.3d at 271.

In this case, the record conclusively shows that Hinton did not request monetary damages in Grievance No. 897737. (Doc. No. 1-4 at 2.) On the standard grievance form that Hinton used to complete Grievance No. 897737, it explicitly directs inmates (such as Hinton) to "[s]tate all relief that [they are] seeking." See (id.). In addition, it explicitly refers inmates to DC-ADM 804 for the "procedures on the inmate grievance system," see (id.), which, in turn, provides that, "[i]f the inmate desires compensation or other legal relief normally available from a court, the inmate must request the specific relief sought in his/her initial grievance." See DC-ADM 804 § 1(A)(11) (emphasis added). This shows that Hinton was clearly on notice that Grievance No. 897737 had to comply with DC-ADM 804 and needed to include any request for monetary or other legal relief. Yet, he did not seek monetary relief in Grievance No. 897737.

Typically, this would result in a procedural default of Hinton's request for monetary damages in this case. See, e.g., Wright v. Sauers, 729 F. App'x 225, 227 (3d Cir. 2018) (unpublished) (noting that prisoner-plaintiff's claim for monetary damages in federal court was procedurally defaulted under DC-ADM 804 because he failed to request monetary damages in his initial grievance with the DOC); Endrikat v. Ransom, No. 21-cv-01684, 2023 WL 3609157, at *4 (M.D. Pa. May 23, 2023) (discussing the requirements of DC-ADM 804 and concluding as follows: "by failing to request monetary damages in his initial grievance, [prisoner-plaintiff] failed to exhaust administrative remedies with respect to his claim for monetary damages"), aff'd

sub nom. Endrikat v. Little, No. 23-2167, 2023 WL 8519196 (3d Cir. Dec. 8, 2023)

(unpublished).  However, the Court notes that Garman's Facility Manager Appeal Response

(which is not discussed in Defendants' brief), states that "any compensation requested is denied."

See (Doc. No. 1-4 at 6 (emphasis added)).  It therefore appears that Garman construed Hinton's

appeal to include a request for some form of monetary compensation and denied such relief.[23]

See Compensation, Black's Law Dictionary (12th ed. 2024) (defining "compensation" as, inter

alia, "[p]ayment of damages, or any other act that a court orders to be done by a person who has

caused injury to another. [] In theory, compensation makes the injured person whole").

An inmate can demonstrate that a procedural default resulting from their failure to

request relief in their initial grievance should be excused if they show that the DOC considered

such a request on appeal and denied it on its merits.  See Bailey v. Yoder, No. 20-cv-01836, 2023

WL 7329526, at *3 (M.D. Pa. Nov. 7, 2023) (concluding plaintiff's claim for money damages

was exhausted even though Plaintiff failed to include claim in original grievance because he

sought money damages as part of his appeal and this request was considered on appeal and

denied on its merits).  Nevertheless, in this case, even if Garman considered Hinton's facility

manager appeal to contain a request for monetary compensation, Hinton never pursued this

request as part of his final appeal to SOIGA.  Instead, Hinton's only requested relief in his final

appeal to SOIGA was "to be released into general population [and] no longer under the

jurisdiction of the SMU Program . . . ."  See (Doc. No. 1-4 at 7).  Moreover, SOIGA's response

to Hinton's appeal shows that it did not interpret the appeal as containing a request for monetary

---

[23]  Considering the substance of Garman's response, it is questionable whether Garman was even addressing Hinton's appeal because Garman's references to "compensation" and "Major Haldeman" do not correspond at all with the substance of Hinton's appeal.

damages insofar as it characterized Hinton's request for relief as a "request to be released into general population," and denied that request.  See (id. at 8).  Therefore, because SOIGA never addressed a request for monetary damages on the merits as part of Hinton's appeal from the denial of Grievance No. 897737, he is now foreclosed from seeking monetary damages here.[24]

Concerning Grievance No. 904200, Hinton requested "punitive damages" in this grievance.  See (Doc. No. 1-4 at 9).  As indicated above, Grievance No. 904200 was rejected because "[t]he issue(s) presented . . . has been reviewed or is currently being reviewed and addressed" in Grievance No. 897737.  See (id. at 10).  The undisputed evidence in the record shows that Hinton did not appeal from the rejection of this grievance, and he needed to do so to fully exhaust it.  See (Doc. No. 45-3).  In this regard, DC-ADM 804 states that "an inmate may appeal the rejected grievance to the Facility Manager in accordance with Section 2 of this procedures manual," which is the policy's standard procedure for grievance appeals.  See DC-

---

[24]  Even if the Court concluded that Hinton fully exhausted his requests for monetary relief, he would be precluded from recovering compensatory damages if he prevailed on his claims in this case.  Under the PLRA, a prisoner such as Hinton is precluded from pursuing a federal civil action seeking damages for mental or emotional injuries without allegations showing that he also suffered a physical injury.  See 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18).");  see also Mitchell v. Horn, 318 F.3d 523, 536 (3d Cir. 2003) (holding that a plaintiff filing a federal civil action seeking compensatory damages for mental or emotional injury must allege (and ultimately prove) that they suffered "a less-than-significant-but-more-than-de minimis physical injury").  Hinton does not include any allegations in the complaint that would remotely suggest that he suffered a "a less-than-significant-but-more-than-de minimis physical injury" because of the allegedly unconstitutional conduct he ascribes to Defendants in his complaint.  See Mitchell, 318 F.3d at 536.  As such, Hinton could not recover compensatory damages for any Section 1983 violations, and the Court would have dismissed his request for compensatory damages.  See 28 U.S.C. § 1915(e)(2)(B)(i)–(iii) (providing that in cases where the Court grants a plaintiff leave to proceed in forma pauperis, "[n]otwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that-- ... (B) the action or appeal—(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief" (emphasis added)).

ADM 804 § 1.A.21 (emphasis omitted).  Because Hinton failed to appeal from the rejection of

Grievance No. 904200, he has not fully exhausted any claim therein, including his request for

monetary damages.

> **b.    Fourteenth Amendment Due Process Claims**

Defendants assert that they are entitled to summary judgment on Hinton's Fourteenth

Amendment procedural and substantive due process claims because (1) any substantive due

process claims based on the conditions of his confinement are foreclosed because of the more-

specific-provision rule and (2) Hinton has no protected liberty interest at issue in this case.  The

Court finds that Defendants are entitled to summary judgment on Hinton's due process claims.

The Fourteenth Amendment of the United States Constitution provides in pertinent part

that: "No State shall . . . deprive any person of life, liberty, or property, without due process of

law."  See U.S. Cons. amend. XIV, § 1.  "The core concept of due process is protection against

arbitrary government action [and, a]s that concept has developed, it has come to have both

substantive and procedural components."  Evans v. Sec'y Pa. Dep't of Corr., 645 F.3d 650, 658

(3d Cir. 2011) (citing County of Sacramento v. Lewis, 523 U.S. 833, 845 (1998)).  The

substantive component "limits what government may do regardless of the fairness of procedures

that it employs," see Boyanowski v. Cap. Area Intermediate Unit, 215 F.3d 396, 399 (3d Cir.

2000), whereas the procedural component "governs the manner in which the government may

infringe upon an individual's life, liberty, or property."  See Evans, 645 F.3d at 662.

> **(1)    Procedural Due Process**

The Court first addresses Hinton's procedural due process claims.  Hinton, as with all

prisoners, is "not completely deprived of the protections of the Due Process Clause simply

because [he is a] prisoner[]."  See id.; Sandin v. Conner, 515 U.S. 472, 485 (1995) (explaining

that although prisoners "do not shed all constitutional rights at the prison gate, lawful incarceration 'brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system'" (internal citation omitted) (quoting Jones v. N.C. Prisoners' Labor Union, Inc., 433 U.S. 119, 125 (1977))).  Thus, "[p]rocedural protections must be afforded to [prisoners] before they are stripped of the rights they still retain while incarcerated."  See Evans, 645 F.3d at 662–63 (citation omitted).

There are two (2) scenarios in which a prisoner holds a liberty interest triggering due process protections:

> when "state statutes and regulations create a liberty interest in freedom from restraint that imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," and (2) when "severe changes in conditions of confinement amount to a grievous loss that should not be imposed without the opportunity for notice and an adequate hearing."  See Renchenski v. Williams, 622 F.3d 315, 325 (3d Cir. 2010) (internal quotation marks and citation omitted).

See Evans, 645 F.3d at 663.  These two (2) scenarios are characterized as a "'so-called state-created liberty interest'" and a "'so-called independent due process liberty interest,'" respectively.  See id. (quoting Renchenski, 622 F.3d at 325).

With respect to independent due process liberty interests, "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon [them] and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight."  See Montanye v. Haymes, 427 U.S. 236, 242 (1976).  Thus, an independent due process liberty interest arises only "when severe changes in conditions of confinement amount to a grievous loss that should not be imposed without the opportunity for notice and an adequate hearing."  See Renchenski, 622 F.3d at 325.  Examples of such severe changes in conditions of confinement include, inter alia, "forced administration of antipsychotic medication, Washington v. Harper, 494 U.S. 210, 221–22

46

(1990), or involuntary transfer to a mental hospital, <u>Vitek v. Jones</u>, 445 U.S. 480, 492 (1980), or, for a prisoner not convicted of a sex offense, forced participation in sex-offender therapy, <u>Renchenski</u>, 622 F.3d at 326." <u>See</u> <u>Evans</u>, 645 F.3d at 665 (first two citations altered from original).

Here, the Court is unable to discern an independent due process liberty interest in the record of this case or even in Hinton's complaint. Indeed, Hinton's allegations do not show that his placement in the RHU caused a severe change to the conditions or degree of his confinement. <u>See</u> <u>id.</u> (stating that "there is no indication that anything changed relating to [plaintiff's] conditions of confinement, let alone anything of a magnitude comparable to the following examples: the forced administration of antipsychotic medication, involuntary transfer to a mental hospital, or for a prisoner not convicted of a sex offense, forced participation in sex-offender therapy"). Moreover, "[b]ecause disciplinary detention and administrative segregation [are] the sort[s] of confinement that inmates should reasonably anticipate receiving at some point in their incarceration, [a plaintiff's] transfer to less amenable and more restrictive quarters [does] not implicate a liberty interest protected by the Due Process Clause." <u>See</u> <u>Torres v. Fauver</u>, 292 F.3d 141, 150 (3d Cir. 2002) (alterations in original) (citations and internal quotation marks omitted); <u>see also</u> <u>Fraise v. Terhune</u>, 283 F.3d 506, 522 (3d Cir. 2002) (stating that, in the context of an independent due process liberty interest, inmates transferred to a particular management unit "were not subjected to confinement that exceeded the sentences imposed upon them or that otherwise violated the Constitution, and therefore no liberty interest created by the Due Process Clause itself was impinged"). Thus, because neither the complaint nor the record shows that Hinton was subjected to conditions of confinement exceeding his sentence or that otherwise

violated the United States Constitution, he was not deprived of an independent due process liberty interest.

Due to the lack of an independent due process liberty interest, the evidence in the record must give rise to a state-created liberty interest for Hinton to avoid summary judgment on his procedural due process claim.  State-created liberty interests are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  See Sandin, 515 U.S. at 484 (internal citations omitted); Wilkinson v. Austin, 545 U.S. 209, 223 (2005) (stating that, "[a]fter Sandin, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life'" (quoting Sandin, 515 U.S. at 484)); Williams v. Sec'y Pa. Dep't of Corr., 848 F.3d 549, 559 (3d Cir. 2017) (explaining that, "in the conditions of confinement context," the liberty interest must be "substantial": "the right alleged must confer freedom from restraint which imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" (internal quotations omitted)). A two (2)-factor inquiry informs whether prison conditions impose "atypical and significant hardship": "(1) the duration of the challenged conditions; and (2) whether the conditions overall imposed a significant hardship in relation to the ordinary incidents of prison life."  See Williams, 848 F.3d at 560 (citing Shoats v. Horn, 213 F.3d 140, 144 (3d Cir. 2000)).  Additionally, when determining whether a state-created liberty interest exists, courts are not to "compare the prisoner's own life before and after the deprivation."  See Powell v. Weiss, 757 F.3d 338, 344 (3d

Cir. 2014).  Instead, "[t]he baseline for determining what is atypical and significant—the ordinary incidents of prison life—is ascertained by what a sentenced inmate may reasonably expect to encounter as a result of his or her conviction in accordance with due process of law." See id. (citations and internal quotation marks omitted).

In this case, neither Hinton's allegations nor the summary judgment record show that Hinton had a state-created liberty interest because he was not subject to an atypical and significant hardship in relation to the ordinary incidents of prison life.  Although Hinton was in the RHU from April 15, 2020 until January 2021, the first sixty (60) days of his administrative custody was the result of the sanctions he received after being found guilty of misconduct.  As such, for purposes of analyzing his claim here, the Court considers that Hinton was subjected to a period of administrative confinement that did not last more than approximately seven (7) months, i.e., from June 17, 2020 until January 2021.[25]  Courts have found similar and even greater deprivations insufficient to establish an atypical and significant hardship on an inmate.  See, e.g., Smith v. Mensinger, 293 F.3d 641, 654 (3d Cir. 2002) (holding that placement in disciplinary confinement for seven (7) months "does not, on its own, violate a protected liberty interest as defined in Sandin"); Griffin v. Vaughn, 112 F.3d 703, 708 (3d Cir. 1997) (determining that placement in administrative custody without a due process hearing for fifteen (15) months was not atypical and significant hardship); Dunbar v. Barone, 487 F. App'x 721, 725 (3d. Cir. 2012) (unpublished) (concluding that plaintiff failed to establish a protected liberty interest after spending approximately eighteen (18) months in disciplinary custody); Lawrence v. Talutto, No.

---

[25]  Even if the Court considered the total time Hinton spent in the RHU from his pre-hearing detention on April 15, 2020, through January 2021, he still fails to show a protected liberty interest for the reasons stated herein.

24-cv-00502, 2024 WL 2328215, at *4 (M.D. Pa. May 22, 2024) ("Lawrence has not identified a protected liberty or property interest with respect to being housed in administrative segregation for 12 months."); Dougan v. PrimeCare Med., Inc., No. 22-cv-00462, 2024 WL 5671151, at *11 (M.D. Pa. Apr. 29, 2024) ("[W]hile prolonged or indefinite solitary confinement may give rise to a protected liberty interest, Pennsylvania district courts have found that 11 or fewer months in solitary confinement does not." (citations omitted), report and recommendation adopted, 2024 WL 5673232 (M.D. Pa. Sept. 10, 2024). But see Shoats v. Horn, 213 F.3d at 144 (holding that eight (8) years in prolonged, indefinite solitary confinement implicated a liberty interest). Furthermore, even if Defendants did not follow the DOC's policies and procedures in maintaining Hinton in the RHU past the conclusion of his disciplinary sanction or in recommending that Hinton remain in the RHU pending his return to the SMU or transfer to the LTSU, any such failures do not give rise to a due process claim because "failure to follow DOC policy does not, in and of itself, result in a violation of due process." See Rambert v. Beard, No. 09-cv-00634, 2012 WL 760619, at *13 (M.D. Pa. Mar. 7, 2012) (citations omitted); Mack v. Clark, No. 21-cv-00004, 2022 WL 2669510, at *9 n.7 (W.D. Pa. July 11, 2022) ("The DOC's policies and procedures do not create a liberty interest protected by the Due Process Clause." (citations omitted)); see also Williams, 848 F.3d at 565 (pointing out that "whether Defendants were complying with DOC policy is irrelevant to our liberty interest analysis"). Overall, Hinton's period in administrative custody is not so atypical and harsh to constitute a deprivation of a protected liberty interest. Accordingly, Defendants are entitled to summary judgment on Hinton's procedural due process claims.

### (2)    Substantive Due Process

As for Hinton's substantive due process claims, the Court recognizes that "the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." See Foucha v. Louisiana, 504 U.S. 71, 80 (1992). To prove a substantive due process claim, a plaintiff must establish "that the particular interest at issue is protected by the substantive due process clause, and that the government's deprivation of that protected interest shocks the conscience." See Kane v. Barger, 902 F.3d 185, 192 (3d Cir. 2018) (citations and internal quotation marks omitted); see also Lewis, 523 U.S. at 847 (explaining that plaintiff asserting substantive due process claim must allege conduct that is "arbitrary[] or conscious shocking"). "This standard's stringency reflects maintenance of the proper proportions of constitutional, as opposed to ordinary tort, violations." Blain v. Twp. of Radnor, 167 F. App'x 330, 333 (3d Cir. 2006) (unpublished) (citing Lewis, 523 U.S. at 847 n.8).

In this case, neither Hinton's allegations nor the undisputed evidence in the record demonstrate that Defendants committed a substantive due process violation. First, and as explained above, he does not identify a protected interest at stake. See Wilkinson, 545 U.S. at 221. Second, to the extent that Hinton's substantive due process claims are based in any part on alleged procedural deficiencies or unconstitutional conditions of his confinement, they fail because of the "more-specific-provision rule," which provides that "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." See Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 260 (3d Cir. 2010) (quoting United States v. Lanier, 520 U.S. 259, 272 n.7 (1997)). Hinton's claims

based on any procedural deficiencies are covered through the lens of a procedural due process challenge and his conditions-of-confinement claims are specifically covered by the Eighth Amendment; as such, Hinton cannot maintain separate substantive due process claims based on this alleged conduct.  See Porter v. Pa. Dep't of Corr., 974 F.3d 431, 447–48 (3d Cir. 2020) (holding that state death row inmate's substantive due process claim lacked distinct facts from and challenged same conduct as his Eighth Amendment claim—prison officials keeping him in solitary confinement for thirty-three (33) years—and was therefore barred under more-specific-provision rule, even if the prison officials' conduct "shock[ed] the conscience irrespective of any procedural safeguards" (citations, internal quotation marks, and emphasis omitted)); Willard v. Pa. Soc. for the Prevention of Cruelty to Animals, 525 F. App'x 217, 219 n.4 (3d Cir. 2013) (unpublished) (affirming district court's dismissal of prisoner-plaintiff's substantive due process claim, pursuant to the "more-specific-provision" rule, where substantive due process claim sought to remedy the same harm as his procedural due process claim).

Third, Hinton does not allege any conduct that shocks the conscience.  Being placed on an administrative custody for the time Hinton remained in the RHU does not shock the conscience.  See Benn v. Universal Health Sys., Inc., 371 F.3d 165, 174 (3d Cir. 2004) ("[T]he threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." (citing Lewis, 523 U.S. at 847 n.8); Newman v. Beard, 617 F.3d 775, 782 (3d Cir. 2010) ("Conduct can violate substantive due process if it shocks the conscience, which encompasses only the most egregious official conduct.").  Hinton minimizes the reason he was in the RHU in the first place, which was due to serious misconduct, and not "minor" conduct, as he alleges.  See, e.g., (Doc. No. 1-5 at 2 (indicating that he committed a "minor infraction")).  He also acknowledges that he committed

this misconduct at a time when he was participating in the probationary period of Phase 1 of the

SMU Program.  See (Doc. No. 1 at 4).  Thus, the fact that Defendants and the PRC

recommended that he remain in the RHU until he can be returned to the SMU Program after his

period of disciplinary custody in the RHU ended does not shock the conscience.  Neither does

the fact that Defendants and the PRC recommended his transfer to the LTSU upon learning that

the SMU was closing and a LTSU program would replace it.

Regarding the LTSU Program, while it is undisputed that no such program existed at SCI

Rockview at the time of the recommended transfer, Hinton offers no evidence to show that

Defendants were not told that this program was replacing the SMU Program or that this

information formed the basis for the recommended transfer.  Simply put, there is no genuine

issue of material fact about whether Defendants' conduct constituted the "most egregious official

conduct," see Benn, 371 F.3d at 174 (citing Lewis, 523 U.S. at 847 n.8); it did not.  Accordingly,

Defendants are also entitled to summary judgment on Hinton's substantive due process claims.

### c.    Fourteenth Amendment Equal Protection[26]

Defendants assert that they are entitled to summary judgment on Hinton's Fourteenth

Amendment equal protection claim because there is no evidence in the record showing that he

---

[26] Hinton references the Fifth Amendment in the portion of his complaint pertaining to his equal
protection claim.  See (Doc. No. 1 at 27).  The Court considers this reference to be in error as
Hinton does not mention the Fifth Amendment in any other submission.  Nevertheless, even if
Hinton intended to assert a Fifth Amendment claim, this claim would be subject to dismissal
because the Fifth Amendment applies to federal officials and Hinton does not allege or cite to
evidence showing that any Defendant is a federal official.  Instead, the uncontradicted evidence
in the records demonstrates that Defendants are state actors, to whom the Fifth Amendment's
Due Process and Equal Protection Clauses do not apply.  See Santos v. Sec'y of D.H.S., 532 F.
App'x 29, 33 (3d Cir. 2013) (unpublished) ("[T]he Fifth Amendment applies to actions of the
federal government, not state actions[.]" (citing Citizens for Health v. Leavitt, 428 F.3d 167, 178
n.11 (3d Cir. 2005))); see also Bergdoll v. City of York, 515 F. App'x 165, 170 (3d Cir. 2013)
(unpublished) (dismissing plaintiff's Fifth Amendment claim against city and county officials
because plaintiff did not allege wrongdoing by any federal actors).

was treated differently than "anyone else who was being removed from one program due to [their] behavior and was pending placement in a different program."  See (id. at 27).  Based on the Court's review of the record, Defendants' motion for summary judgment will be granted as to Hinton's equal protection claim.

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike.  See U.S. Const. amend. XIV, § 1; City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (citing Plyer v. Doe, 457 U.S. 202, 216 (1982)).  To prove an equal protection claim, a plaintiff must show that: (1) when compared with others similarly situated, they were selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person.  See Vurimindi v. City of Phila., 521 F. App'x 62, 65 (3d Cir. 2013) (unpublished) (citing Andrews v. City of Phila., 895 F.2d 1469, 1478 (3d Cir. 1990)).

Here, because Hinton is not a member of a protected class, see Abdul-Akbar v. McKelvie, 239 F.3d 307, 317 (3d Cir. 2001) (concluding that prisoners are not members of a protected class); Cospito v. Heckler, 742 F.2d 72, 83 (3d Cir. 1984) ("As this court has noted, classification according to mental illness has not been recognized as a suspect class which requires heightened or strict scrutiny under the equal protection clause." (citations omitted)), he must proceed under a "class of one theory."[27]  To demonstrate a claim "for 'class of one' equal protection, a plaintiff

---

[27]  Hinton does not allege or argue that he is a member of a protected class and concedes that he is pursuing "class of one" equal protection claims.  See (Doc. No. 32 at 20).

must at a minimum [prove] that [they were] intentionally treated differently from others similarly situated by the defendant and that there was no rational basis for such treatment." See Phillips v. County of Allegheny, 515 F.3d 224, 243 (3d Cir. 2008). To be "similarly situated," parties must be "alike in all relevant aspects." See Startzell v. City of Phila., 533 F.3d 183, 203 (3d Cir. 2008). Nevertheless, "'similarly situated' does not mean 'identically situated.'" See Harvard v. Cesnalis, 973 F.3d 190, 205 (3d Cir. 2020) (quoting Bennun v. Rutgers State Univ., 941 F.2d 154, 178 (3d Cir. 1991), abrogated on other grounds by St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515–16 (1993)). "[C]ourts conducting the 'similarly situated' inquiry 'should not demand exact correlation, but should instead seek relevant similarity.'" Id. (quoting Stimmel v. Sessions, 879 F.3d 198, 212 (6th Cir. 2018) (citation omitted)). Determination of whether individuals are similarly situated is a "'case-by-case fact-intensive inquiry.'" See McLaughlin v. Forty Fort Borough, 64 F. Supp. 3d 631, 648 (M.D. Pa. 2014) (quoting Suber v. Guinta, 902 F. Supp. 2d 591, 607 (E.D. Pa. 2012)).

Here, Hinton does not identify any evidence in the record showing that he was treated differently than similarly situated individuals at SCI Rockview. To the contrary, he attaches evidence to his complaint contradicting his equal protection claim, namely Simms's affidavit. In this affidavit, Simms avers that he has "seen several people get placed on 'AC' status . . . pending a transfere [sic] to one program or another, but only to be told that 'the program placement was denied,'" resulting in the prisoner's return to general population. See (Doc. No. 1-8 at 5–6). Moreover, Sims states that the "PRC has done the same thing to [him]." See (id. at 6). This evidence in the record demonstrates that neither Defendants nor the PRC treated Hinton differently than other similarly situated inmates, and this lack of evidence is fatal to his equal

protection claim.  Accordingly, Defendants are entitled to summary judgment on Hinton's "class of one" equal protection claim.

### d.    Eighth Amendment Conditions of Confinement

Defendants move for summary judgment on Hinton's Eighth Amendment conditions-of-confinement claims against them because (1) his placement in the RHU, by itself, does not violate the Constitution and (2) he fails to show that he was deprived of any of the necessities of life while in the RHU.  (Doc. No. 46 at 22–25.)  As explained below, Defendants are entitled to summary judgment on Hinton's conditions-of-confinement claims.

"The Eighth Amendment guarantees the right to be free from 'cruel and unusual punishments' while in custody."  See Ricks v. Shover, 891 F.3d 468, 473 (3d Cir. 2018) (citing Whitley v. Albers, 475 U.S. 312, 318 (1986)).  "A properly stated Eighth Amendment claim must [include] a subjective and objective element."  See id. (citing Hudson v. McMillian, 503 U.S. 1, 8 (1992)).  The subjective element requires evidence showing that the "defendant official act[] with a 'sufficiently culpable state of mind,'" see id. (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)), while the objective element requires the plaintiff to demonstrate that the defendant official's conduct was "objectively 'harmful enough,' or 'sufficiently serious' to violate the Constitution."  See id. (quoting Wilson, 501 U.S. at 298, 303).

When advancing an Eighth Amendment conditions-of-confinement claim, the plaintiff must show that: (1) they suffered a "sufficiently serious" deprivation; and (2) the prison official defendant had a sufficiently culpable state of mind.  See Clark v. Coupe, 55 F.4th 167, 179 (3d Cir. 2022) (quoting Thomas v. Tice, 948 F.3d 133, 138 (3d Cir. 2020)).  The first element is an objective standard requiring evidence demonstrating that the plaintiff was denied "the minimal civilized measures of life's necessities."  See id. (quoting Wilson, 501 U.S. at 299).  Only

"extreme deprivations" are sufficient to make out a conditions of confinement claim. See Hudson, 503 U.S. at 8–9. Thus, it is insufficient for a plaintiff to show that they were merely uncomfortable. See id. Rather, the plaintiff must demonstrate that the conditions of their confinement posed a "substantial risk of serious harm" to their health or safety. See id. (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)).

A plaintiff must prove that the deprivation is sufficiently serious when viewed within the context of "contemporary standards of decency." See Helling v. McKinney, 509 U.S. 25, 36 (1993). "Although a combination of confinement conditions—considered alone constitutionally insufficient—may present an Eighth Amendment violation, they nevertheless must cumulatively produce 'the deprivation of a single, identifiable human need such as food, warmth, or exercise.'" Young v. Ferguson, No. 18-cv-00879, 2020 WL 1505683, at *6–7 (M.D. Pa. Mar. 30, 2020) (quoting Wilson, 501 U.S. at 304), aff'd, 830 F. App'x 375 (3d Cir. 2020) (unpublished)); see also Griffin, 112 F.3d at 709 (explaining that basic human needs include "food, clothing, shelter, sanitation, medical care and personal safety").

As explained above, the second element is subjective and requires the plaintiff to prove that the defendant was deliberately indifferent to a substantial risk of serious harm to the plaintiff's health or safety. See id. (citing Farmer, 511 U.S. at 834). This requires a plaintiff to show that the defendant was aware of the risk and disregarded it. See id. (citing Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001)).

Concerning the objective element of Hinton's conditions-of-confinement claim, the only conditions of confinement Hinton identifies in his deposition are that his confinement in the RHU did not permit him to attend vocational schooling, he could not attend his Islamic religious service every Friday, he did not have visits from his family, had only one (1) hour for exercise

each day, and could only speak to other inmates through the metal door of his cell.  See (id. at 12, 17–18).  These conditions, either alone or in conjunction, are insufficient to establish a triable issue of fact on the objective element of an Eighth Amendment conditions-of-confinement claim.

To the extent that Hinton alleges that his placement in administrative segregation, in itself, constitutes cruel and usual punishment, he is mistaken.  See Young, 830 F. App'x at 376 ("Placement in administrative segregation, by itself, is insufficient to constitute cruel and unusual punishment." (citing Gibson v. Lynch, 652 F.2d 348, 352 (3d Cir. 1981)); Bertolette v. Little, No. 23-cv-00330, 2023 WL 9100642, at *8 (W.D. Pa. Oct. 26, 2023) ("Placement in the RHU alone does not violate the Eighth Amendment."), report and recommendation adopted, 2023 WL 8865873 (W.D. Pa. Dec. 22, 2023).  In addition, his lack of opportunity to attend vocational schooling is insufficient because such schooling is not a basic human need.  He also was not obtaining such training prior to his placement in the RHU; instead, he admits he was only on a wait list for schooling.  See (Doc. No. 45-2 at 17).

Concerning his inability to attend religious services on Friday, Hinton identifies no evidence that he could not otherwise practice his religion while in the RHU, and he does not show that this restriction negatively affected his well-being or, more importantly, deprived him of a basic human need.  See, e.g., Allen v. Passaic County Jail, No. 09-cv-00408, 2009 WL 4591206, at *9 (E.D. Pa. Dec. 4, 2009) (determining that prisoner-plaintiff's allegations that he lacked hot water, ate cold food, and was unable to make collect calls and attend religious services did not constitute an Eighth Amendment violation); Hosannah v. Nassau County, No. 16-cv-01045, 2022 WL 889028, at *5 (E.D.N.Y. Mar. 25, 2022) ("Although it is deplorable that plaintiff was unable to attend his wife's funeral and oftentimes could not attend religious service, it cannot be said these restrictions threatened his well-being or deprived plaintiff of his basic

human needs." (citation and internal quotation marks omitted)).  As for the one (1)-hour of

exercise Hinton was limited to per day, this limitation does not rise to the level of a constitutional

violation.  See Gattis v. Phelps, 344 F. App'x 801, 805 (3d Cir. 2009) (unpublished) (concluding

that prisoner's claim that "his exercise was limited to three days per week and that he was not

guaranteed outdoor exercise at all times—was insufficiently serious to implicate the Eighth

Amendment"); Christian v. Garman, No. 20-cv-01842, 2021 WL 1017251, at *1, 7 (M.D. Pa.

Mar. 17, 2021) (concluding that prisoner's claim that SCI Rockview's reduction of prisoners'

access to the exercise yard to "once every other day, and . . . to groups of no more than ten (10)

inmates at a time" in response to the COVID-19 pandemic, along with no factual allegations that

the exercise limitations impacted the prisoner's health, did not implicate the Eighth Amendment);

see also Wishon v. Gammon, 978 F.2d 446, 449 (8th Cir. 1992) (determining that forty-five (45)

minutes of out-of-cell recreation time per week is constitutional).

Hinton's inability to visit with his family does not violate the Eighth Amendment.  See

Zamarron v. Madrid, No. 21-cv-00919, 2025 WL 1309353, at *12 (D.N.M. May 6, 2025)

("Removing visitation privileges violates the Eighth Amendment only if the removal is arbitrary

or lasts for several years." (citations omitted)), report and recommendation adopted, 2025 WL

1755565 (D.N.M. June 25, 2025); Simmons v. Wolff, 594 F. Supp. 2d 6, 9 (D.D.C. 2009)

("Deprivations such as infrequent or no visits from family . . . simply do not meet the threshold

of 'extreme deprivations' required to state an Eighth Amendment claim regarding conditions of

prison confinement."); see also Overton v. Bazzetta, 539 U.S. 126, 136–37 (2003) (concluding

that state prison's two-year restriction on visitation for inmates with two substance-abuse

violations did not violate the Eighth Amendment because it was "not a dramatic departure from

accepted standards for conditions of confinement," did not "create inhumane prison conditions,

deprive inmates of basic necessities, or fail to protect their health or safety," or "involve the infliction of pain or injury, or deliberate indifference to the risk that it might occur"). Neither does any limitation on Hinton's ability to communicate with other inmates, even if such communication involved yelling from his cell. See, e.g., Silverstein v. Fed. Bureau of Prisons, 559 F. App'x 739, 756 (10th Cir. 2014) (unpublished) (holding that prison's restrictions on plaintiff-prisoner's social contacts were not sufficiently serious to implicate the Eighth Amendment where plaintiff could, inter alia, communicate with other prisoners by yelling cell to cell).

Even when viewed together, Hinton's conditions of confinement do not reach the level of an Eighth Amendment violation because they do not amount to a deprivation of life's necessities. Hinton does not complain that he was housed in a cell in deplorable conditions or that he did not have sufficient food and clothing. While Hinton asserts that he was only able to talk to prison officials through his steel door for two or three minutes a day, see (Doc. No. 45-2 at 19), he does not point to any evidence showing that he was unable to obtain medical care (including mental health care) if needed or that his safety was jeopardized while in the RHU.[28] Overall, a reasonable jury could not conclude that Hinton was deprived of the "minimal civilized measure of life's necessities" while in the RHU. See Farmer, 511 U.S. at 834.

As for the second element of Hinton's Eighth Amendment claim, there is no evidence in the record showing that Defendants knew of the risks posed by long-term solitary confinement. Hinton's conclusory statements and allegations that Defendants knew about these risks is insufficient at this stage. Nevertheless, even if the Court presumes that Defendants generally

---

[28] The Court is mindful that the alleged events at issue in this case occurred during the COVID-19 pandemic when prisons took additional restrictive measures to prevent the spread of the disease.

knew about risks associated with long-term solitary confinement, nothing in the record shows that Defendants knew that Hinton was experiencing issues caused by those risks or knew facts from which they could infer that Hinton should not be in the RHU. Hinton does not allege that he informed any Defendant that he was negatively affected by his confinement in the RHU, nor does he allege that he sought assistance for any psychological issues he was experiencing while in the RHU. In fact, in Muick's December 11, 2020 memo to Hinton, which Hinton attaches to his complaint, Muick states that Hinton "was assessed at his cell door on [November 6, 2020, and he] declined an out-of-cell session." See (Doc. No. 1-5 at 5). Defendants' discovery responses submitted by Hinton also show that his mental health was taken into consideration when recommending his transfer to the LTSU Program. See (Doc. No. 32-2 at 17–18, 23, 29).

In the end, the uncontroverted evidence in the record shows that Hinton's serious misconduct led to his initial disciplinary custody in the RHU for sixty (60) days. He committed this misconduct while on probation for Phase 1 of the SMU Program, and as a result, it was initially recommended that he return to the SMU Program after completing his sixty (60) days in disciplinary custody in the RHU. However, the SMU Program was later closed, and Defendants were told to place him for transfer in the LTSU Program, even though it was not in existence yet at SCI Rockview. Neither Defendants nor the PRC were the ultimate decision-makers as to which SHU Program, if any, Hinton would be returned to upon his release from the RHU. No reasonable jury could find that Defendants were deliberately indifferent where the record does not indicate that they knew Hinton was experiencing any of the risks of extended confinement in the RHU or that Defendants lacked a legitimate penological purpose when placing and then keeping Hinton in conditions more restrictive than general population. Accordingly, Defendants

are entitled to summary judgment on Hinton's Eighth Amendment conditions-of-confinement claim.

### e.    Eighth Amendment Excessive Force

Defendants contend that the Court should grant summary judgment in their favor on Hinton's Eighth Amendment excessive force claim because this claim essentially duplicates his conditions-of-confinement claim, and he does not show that Defendants employed any force against him.  See (Doc. No. 46 at 26).  The Court agrees.

Where a prison official is alleged to have used excessive force in violation of the Eighth Amendment, the pertinent inquiry for the subjective element is "whether [the] force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  See Hudson, 503 U.S. at 7; Chavarriaga v. N.J. Dep't of Corr., 806 F.3d 210, 231 (3d Cir. 2015) (explaining that "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated[,]" and "[t]his is true whether or not significant injury is evident").  In conducting this inquiry, there are several factors that a court must consider in determining whether a prison official has used excessive force against a prisoner, including:

> (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) "the extent of injury inflicted"; (4) "the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them"; and (5) "any efforts made to temper the severity of a forceful response."

See Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (quoting Whitley, 475 U.S. at 321).

As for the objective element, the pertinent inquiry is whether the prison official's actions were "harmful enough," see Hudson, 503 U.S. at 8, or "sufficiently serious," see Wilson, 501 U.S. at 298.  "[N]ot every malevolent touch by a prison guard gives rise to a federal cause of

action." <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 37 (2010) (citation omitted).  As a result, "[t]he Eighth

Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from

constitutional recognition de minimis uses of physical force, provided that the use of force is not

of a sort 'repugnant to the conscience of mankind.'"  <u>See</u> <u>Hudson</u>, 503 U.S. at 9–10 (quoting

<u>Whitley</u>, 475 U.S. at 327).  Instead, the Eighth Amendment prohibits the use of force that offends

"contemporary standards of decency[,]" regardless of whether "significant injury is evident[;]"

although, the extent of injury may provide "some indication of the amount of force applied" or

"whether the use of force could plausibly have been thought necessary in a particular situation."

<u>See</u> <u>Wilkins</u>, 559 U.S. at 37 (citation, internal citation, and internal quotation marks omitted).

In this case, Hinton's excessive force claim is misguided and meritless.  There is no

evidence in the record that Defendants subjected him to any force, much less force that is

"repugnant to the conscience of mankind."  <u>See</u> <u>Whitley</u>, 475 U.S. at 327.  Hinton's excessive

force claim is just a repackaging of his conditions-of-confinement claim.  Accordingly,

Defendants are entitled to summary judgment on Hinton's Eighth Amendment excessive force

claim.

## IV.    CONCLUSION

For the reasons set forth above, the Court will deny Hinton's request to treat his some of

his collective preliminary-objection-titled submission as a motion for summary judgment, grant

Defendants' motion for summary judgment, direct the Clerk of Court to enter judgment in

Defendants' favor and against Hinton on all claims asserted against them in his complaint, deem

Hinton's "Motion to Accelerate Hearing on Motion for Summary Judgment" withdrawn, and direct the Clerk of Court to close this case.[29]  An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania

---

[29]  Defendants also raised a defense of qualified immunity.  (Doc. No. 46 at 28–30.)  Because the Court is granting summary judgment on the merits, the Court need not decide the issue of qualified immunity.  See Beers-Capitol, 256 F.3d at 126 n.1 (pointing out that the issue of qualified immunity was not reached by the district court because it granted summary judgment on the merits, and declining to decide the issue of qualified immunity as to the defendants for whom it affirmed summary judgment).